BANGOR PUNTA OPERATIONS, INC., ET AL. v.
BANGOR & AROOSTOOK RAILROAD CO. ET AL.

No. 73–718.  Argued April 15, 1974—Decided June 19, 1974

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and WHITE, JJ., joined, *post*, p. 719.

*James V. Ryan* argued the cause for petitioners. With him on the briefs was *Roger L. Waldman.*

*Alan L. Lefkowitz* argued the cause for respondents. With him on the brief was *Edward T. Robinson.*[*]

MR. JUSTICE POWELL delivered the opinion of the Court.

This case involves an action by a Maine railroad corporation seeking damages from its former owners for violations of federal antitrust and securities laws, applicable state statutes, and common-law principles. The complaint alleged that the former owners had engaged in various acts of corporate waste and mismanagement during the period of their control. The shareholder presently in control of the railroad acquired more than 99% of the railroad's shares from the former owners long after the alleged wrongs occurred. We must decide whether equitable principles applicable under federal and state law preclude recovery by the railroad in these circumstances.

## I

Respondent Bangor & Aroostook Railroad Co. (BAR), a Maine corporation, operates a railroad in the northern part of the State of Maine. Respondent Bangor Investment Co., also a Maine corporation, is a wholly owned subsidiary of BAR. Petitioner Bangor Punta Corp. (Bangor Punta), a Delaware corporation, is a diversified investment company with business operations in several areas. Petitioner Bangor Punta Operations, Inc. (BPO), a New York corporation, is a wholly owned subsidiary of Bangor Punta.

On October 13, 1964, Bangor Punta, through its subsidiary BPO, acquired 98.3% of the outstanding stock of BAR. This was accomplished by the subsidiary's pur-

---

[*]*Fritz R. Kahn, Betty Jo Christian,* and *Charles H. White, Jr.,* filed a brief for the Interstate Commerce Commission as *amicus curiae.*

chase of all the assets of Bangor & Aroostook Corp. (B&A), a Maine corporation established in 1960 as the holding company of BAR. From 1964 to 1969, Bangor Punta controlled and directed BAR through its ownership of about 98.3% of the outstanding stock. On October 2, 1969, Bangor Punta, again through its subsidiary, sold all of its stock for $5,000,000 to Amoskeag Co., a Delaware investment corporation. Amoskeag assumed responsibility for the management of BAR and later acquired additional shares to give it ownership of more than 99% of all the outstanding stock.

In 1971, BAR and its subsidiary filed the present action against Bangor Punta and its subsidiary in the United States District Court for the District of Maine. The complaint specified 13 counts of alleged mismanagement, misappropriation, and waste of BAR's corporate assets occurring during the period from 1960 through 1967 when B&A and then Bangor Punta controlled BAR.[1] Damages were sought in the amount of $7,000,000 for violations of both federal and state laws. The federal statutes and regulations alleged to have been violated included § 10 of the Clayton Act, 15 U. S. C. § 20; § 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j (b); and Rule 10b–5, 17 CFR § 240.10b–5, as promulgated thereunder by the Securities and Exchange Commission. The state claims were grounded on § 104 of the Maine Public Utilities Act, Maine Rev. Stat.

---

[1] Several of the alleged acts of corporate mismanagement occurred between 1960 and 1964 when B&A, BAR's holding company, was in control of the railroad. Liability for these acts was nevertheless sought to be imposed on Bangor Punta, even though it had no interest in either BAR or B&A during this period. The apparent basis for liability was the 1964 purchase agreement between B&A and Bangor Punta. The complaint in the instant case alleged that under the agreement Bangor Punta, through its subsidiary, assumed "all . . . debts, obligations, contracts and liabilities" of B&A.

Ann., Tit. 35, § 104 (1965), and the common law of Maine.

The complaint focused on four intercompany transactions which allegedly resulted in injury to BAR.[2] Counts I and II averred that B&A, and later Bangor Punta, overcharged BAR for various legal, accounting, printing, and other services. Counts III, IV, V, and VI averred that B&A improperly acquired the stock of the St. Croix Paper Co. which BAR owned through its subsidiary. Counts VII, VIII, IX, and X charged that B&A and Bangor Punta improperly caused BAR to declare special dividends to its stockholders, including B&A and Bangor Punta, and also caused BAR's subsidiary to borrow in order to pay regular dividends. Counts XI, XII, and XIII charged that B&A improperly caused BAR to excuse payment by B&A and Bangor Punta of the interest due on a loan made by BAR to B&A. In sum, the complaint alleged that during the period of their control of BAR, Bangor Punta, and its predecessor in interest B&A, "exploited it solely for their own purposes" and "calculatedly drained the resources of BAR in violation of law for their own benefit."

The District Court granted petitioners' motion for summary judgment and dismissed the action. 353 F. Supp. 724 (1972). The court first observed that although the suit purported to be a primary action brought in the name of the corporation, the real party in interest and hence the actual beneficiary of any recovery, was Amoskeag, the present owner of more than 99% of the outstanding stock of BAR. The court then noted that Amoskeag had acquired all of its BAR stock long after the alleged wrongs occurred and that Amoskeag

---

[2] Bangor Punta was alleged to have effected these transactions through its wholly owned subsidiary BPO. For purposes of clarity, we shall attribute BPO's actions directly to Bangor Punta.

did not contend that it had not received full value for its purchase price, or that the purchase transaction was tainted by fraud or deceit. Thus, any recovery on Amoskeag's part would constitute a windfall because it had sustained no injury. With this in mind, the court then addressed the claims based on federal law and determined that Amoskeag would have been barred from maintaining a shareholder derivative action because of its failure to satisfy the "contemporaneous ownership" requirement of Fed. Rule Civ. Proc. 23.1 (1).[3] Finding that equitable principles prevented the use of the corporate fiction to evade the proscription of Rule 23.1, the court concluded that Amoskeag's efforts to recover under the Securities Exchange Act and the Clayton Act must fail. Turning to the claims based on state law, the court recognized that the applicability of Rule 23.1 (1) has been questioned where federal jurisdiction is based on diversity of citizenship.[4] The court found it unnecessary

---

[3] Rule 23.1 (1), which specifies the requirements applicable to shareholder derivative actions, states that the complaint shall aver that "the plaintiff was a shareholder or member at the time of the transaction of which he complains . . . ." This provision is known as the "contemporaneous ownership" requirement. See 3B J. Moore, Federal Practice ¶ 23.1 et seq. (2d ed. 1974).

[4] The "contemporaneous ownership" requirement in shareholder derivative actions was first announced in *Hawes* v. *Oakland,* 104 U. S. 450 (1882), and soon thereafter adopted as Equity Rule 97. This provision was later incorporated in Equity Rule 27 and finally in the present Rule 23.1. After the decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), the question arose whether the contemporaneous-ownership requirement was one of procedure or substantive law. If the requirement were substantive, then under the regime of *Erie* it could not be validly applied in federal diversity cases where state law permitted a noncontemporaneous shareholder to maintain a derivative action. See 3B J. Moore, Federal Practice ¶¶ 23.1.01–23.1.15 [2] (2d ed. 1974). Although most cases treat the requirement as one of procedure, this Court has never resolved the issue. *Ibid.*

to resolve this issue, however, since its examination of state law indicated that Maine probably followed the "prevailing rule" requiring contemporaneous ownership in order to maintain a shareholder derivative action. Thus, whether the federal rule or state substantive law applied, the present action could not be maintained.

The United States Court of Appeals for the First Circuit reversed. 482 F. 2d 865 (1973). The court stated that its disagreement with the District Court centered primarily on that court's assumption that Amoskeag would be the "sole beneficiary" of any recovery by BAR. The Court of Appeals thought that in view of the railroad's status as a "public" or "quasi-public" corporation and the important nature of the services it provides, any recovery by BAR would also inure to the benefit of the public. The court stated that this factor sufficed to support a corporate cause of action and rendered any windfall to Amoskeag irrelevant. In addition, the court noted that to permit BAR to recover for the alleged wrongs would provide a needed deterrent to "patently undesirable conduct" in the management of railroads. *Id.,* at 871. Finally, the court confronted the possibility that any corporate recovery might be diverted to enrich the present BAR shareholders, mainly Amoskeag, rather than re-invested to improve the railroad's services for the benefit of the public. Although troubled by this prospect, the court concluded that the public interest would nonetheless be better served by insuring that petitioners would not be immune to civil liability for their allegedly wrongful conduct. Without deciding the issue, the court also suggested the possibility of devising "court-imposed limitations" on the use BAR might make of any recovery to insure that the public would actually be benefited.

We granted petitioners' application for certiorari. 414 U. S. 1127 (1974). We now reverse.

## II

### A

We first turn to the question whether respondent corporations may maintain the present action under § 10 of the Clayton Act, 15 U. S. C. § 20, and § 10 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j (b), and Rule 10b–5, 17 CFR § 240.10b–5. The resolution of this issue depends upon the applicability of the settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions. See, *e. g., Bloodworth* v. *Bloodworth,* 225 Ga. 379, 387, 169 S. E. 2d 150, 156–157 (1969); *Bookman* v. *R. J. Reynolds Tobacco Co.,* 138 N. J. Eq. 312, 372, 48 A. 2d 646, 680 (Ch. 1946); *Babcock* v. *Farwell,* 245 Ill. 14, 40–41, 91 N. E. 683, 692–693 (1910).[5] This principle has been invoked with special force where a shareholder purchases all or substantially all the shares of a corporation from a vendor at a fair price, and then seeks to have the corporation recover against that vendor for prior corporate mismanagement. See, *e. g., Matthews* v. *Headley Chocolate Co.,* 130 Md. 523, 532–535, 100 A. 645, 650–651 (1917); *Home Fire Insurance Co.* v. *Barber,* 67 Neb. 644, 661–662, 93 N. W. 1024, 1030–1031 (1903). See also *Amen* v. *Black,* 234 F. 2d 12, 23 (CA10 1956). The equitable considerations precluding recovery in such cases were explicated long ago by Dean (then Commissioner) Roscoe Pound in *Home*

---

[5] This principle obtains in the great majority of jurisdictions. See, *e. g., Russell* v. *Louis Melind Co.,* 331 Ill. App. 182, 72 N. E. 2d 869 (1947); *Klum* v. *Clinton Trust Co.,* 183 Misc. 340, 48 N. Y. S. 2d 267 (1944); *Clark* v. *American Coal Co.,* 86 Iowa 436, 53 N. W. 291 (1892); *Boldenweck* v. *Bullis,* 40 Colo. 253, 90 P. 634 (1907). See 13 W. Fletcher, Cyclopedia Corporations § 5866 (1970 ed.); H. Ballantine, Corporations § 148 (1946 ed.).

*Fire Insurance Co.* v. *Barber, supra.* Dean Pound, writing for the Supreme Court of Nebraska, observed that the shareholders of the plaintiff corporation in that case had sustained no injury since they had acquired their shares from the alleged wrongdoers after the disputed transactions occurred and had received full value for their purchase price. Thus, any recovery on their part would constitute a windfall, for it would enable them to obtain funds to which they had no just title or claim. Moreover, it would in effect allow the shareholders to recoup a large part of the price they agreed to pay for their shares, notwithstanding the fact that they received all they had bargained for. Finally, it would permit the shareholders to reap a profit from wrongs done to others, thus encouraging further such speculation. Dean Pound stated that these consequences rendered any recovery highly inequitable and mandated dismissal of the suit.

The considerations supporting the *Home Fire* principle are especially pertinent in the present case. As the District Court pointed out, Amoskeag, the present owner of more than 99% of the BAR shares, would be the principal beneficiary of any recovery obtained by BAR. Amoskeag, however, acquired 98.3% of the outstanding shares of BAR from petitioner Bangor Punta in 1969, well after the alleged wrongs were said to have occurred. Amoskeag does not contend that the purchase transaction was tainted by fraud or deceit, or that it received less than full value for its money. Indeed, it does not assert that it has sustained any injury at all. Nor does it appear that the alleged acts of prior mismanagement have had any continuing effect on the corporations involved or the value of their shares.[6] Nevertheless, by causing the pres-

---

[6] In *Home Fire,* Dean Pound suggested that equitable principles might not prevent recovery where the effects of the wrongful acts continued and resulted in injury to present shareholders. 67 Neb.

ent action to be brought in the name of respondent corporations, Amoskeag seeks to recover indirectly an amount equal to the $5,000,000 it paid for its stock, plus an additional $2,000,000. All this would be in the form of damages for wrongs petitioner Bangor Punta is said to have inflicted, not upon Amoskeag, but upon respondent corporations during the period in which Bangor Punta owned 98.3% of the BAR shares. In other words, Amoskeag seeks to recover for wrongs Bangor Punta did to *itself* as owner of the railroad.[7] At the same time it reaps this windfall, Amoskeag desires to retain all its BAR stock. Under *Home Fire*, it is evident that Amoskeag would have no standing in equity to maintain the present action.[8]

---

644, 662, 93 N. W. 1024, 1031. In their complaint in the instant case, respondents alleged that "[t]he injury to BAR is a continuing one surviving the aforesaid sale [from petitioner BPO] to Amoskeag." The District Court noted that respondents alleged no facts to support this contention and therefore found any such exception inapplicable. 353 F. Supp. 724, 727 n. 1 (1972). Respondents apparently did not renew this contention on appeal.

[7] Similarly, as to the period before October 1964, Amoskeag seeks to recover for wrongs B&A and its shareholders did to *themselves* as owners of the railroad.

[8] Conceding the lack of equity in any recovery by Amoskeag, the dissent argues that the present action can nevertheless be maintained because there are 20 minority shareholders, holding less than 1% of the BAR stock, who owned their shares "during the period from 1960 through 1967 when the transactions underlying the railroad's complaint took place, and who still owned that stock in 1971 when the complaint was filed." *Post*, at 722. The dissent would conclude that the existence of these innocent minority shareholders entitles BAR, and hence Amoskeag, to recover the entire $7,000,000 amount of alleged damages.

Aside from the illogic of such an approach, the dissent's position is at war with the precedents, for the *Home Fire* principle has long been applied to preclude full recovery by a corporation even where there are innocent minority shareholders who acquired their shares

We are met with the argument, however, that since the present action is brought in the name of respondent corporations, we may not look behind the corporate entity to the true substance of the claims and the actual beneficiaries. The established law is to the contrary. Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. *New Colonial Ice Co.* v. *Helvering,* 292 U. S. 435, 442 (1934); *Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic Assn.,* 247 U. S. 490, 501 (1918). In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form. Thus, where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded. *Amen* v. *Black, supra; Capitol Wine & Spirit Corp.* v. *Pokrass,* 277 App. Div. 184, 98 N. Y. S. 2d 291 (1950), aff'd, 302 N. Y. 734, 98 N. E. 2d 704 (1951); *Matthews* v. *Headley Chocolate Co., supra; Home Fire Insurance Co.* v. *Barber, supra.* It follows that Amoskeag, the principal beneficiary of any recovery and itself estopped from complaining of petitioners' alleged wrongs, cannot avoid the command of equity through the guise of proceeding in the name of respondent corporations which it owns and controls.

## B

Respondents fare no better in their efforts to maintain the present actions under state law, specifically § 104

prior to the alleged wrongs. See cases cited at n. 5, *supra,* and accompanying text. The dissent also mistakes the factual posture of this case, since the respondent corporations did not institute this action for the benefit of the minority shareholders. See discussion at n. 15, *infra.*

of the Maine Public Utilities Act, Maine Rev. Stat. Ann., Tit. 35, § 104 (1965), and the common law of Maine. In *Forbes* v. *Wells Beach Casino, Inc.*, 307 A. 2d 210, 223 n. 10 (1973), the Maine Supreme Judicial Court recently declared that it had long accepted the equitable principle that a "stockholder has no standing if either he or his vendor participated or acquiesced in the wrong . . . ." See *Hyams* v. *Old Dominion Co.*, 113 Me. 294, 302, 93 A. 747, 750 (1915).[9] Thus, Amoskeag would be barred from maintaining the present action under Maine law since it acquired its shares from petitioners, the alleged wrongdoers. Moreover, the principle that the corporate entity may be disregarded if equity so demands is accepted by Maine precedents. See, *e. g., Bonnar-Vawter, Inc.* v. *Johnson,* 157 Me. 380, 387–388, 173 A. 2d 141, 145 (1961).

## III

In reaching the contrary conclusion, the Court of Appeals stated that it could not accept the proposition that Amoskeag would be the "sole beneficiary" of any recovery by BAR. 482 F. 2d, at 868. The court noted that in view of the railroad's status as a "quasi-public" corporation and the essential nature of the services it provides, the public had an identifiable interest in BAR's

---

[9] In addition, the new Maine Business Corporation Act adopts the contemporaneous-ownership requirement for shareholder derivative actions. See Maine Rev. Stat. Ann., Tit. 13–A, § 627.1.A (1974). This provision apparently became effective two days after the present action was filed. As the District Court noted, it is an open question whether Maine in fact had a contemporaneous-ownership requirement prior to that time. 353 F. Supp., at 727. See R. Field, V. McKusick & L. Wroth, Maine Civil Practice § 23.2, p. 393 (2d ed. 1970). In the absence of any indication that Maine would not have followed the "prevailing view," the District Court determined that the contemporaneous-ownership requirement of Fed. Rule Civ. Proc. 23.1 applied.

financial health. Thus, any recovery by BAR would accrue to the benefit of the public through the improvement in BAR's economic position and the quality of its services. The court thought that this factor rendered any windfall to Amoskeag irrelevant.

At the outset, we note that the Court of Appeals' assumption that any recovery would necessarily benefit the public is unwarranted. As that court explicitly recognized, any recovery by BAR could be diverted to its shareholders, namely Amoskeag, rather than re-invested in the railroad for the benefit of the public. *Id.*, at 871. Nor do we believe this possibility can be avoided by respondents' suggestion that the District Court impose limitations on the use BAR might make of the recovery.[10] There is no support for such a result under either federal or state law. BAR would be entitled to distribute the recovery in any lawful manner it may choose, even if such distribution resulted only in private enrichment. In sum, there is no assurance that the public would receive any benefit at all from these funds.

The Court of Appeals' position also appears to overlook the fact that Amoskeag, the actual beneficiary of any recovery through its ownership of more than 99% of the BAR shares, would be unjustly enriched since it has sustained no injury.[11] It acquired substantially all the BAR

---

[10] The Court of Appeals noted that its decision "is not conditioned on the devising of court-imposed limitations on the uses of any corporate recovery." 482 F. 2d 865, 871. Counsel for respondents also admitted at oral argument that BAR had no legal obligation to use its recovery to improve the railroad's services in order to benefit the public. Tr. of Oral Arg. 17.

[11] The unjust enrichment of Amoskeag is inevitable. As the owner of more than 99% of the BAR shares, Amoskeag would obviously benefit from any increase in the value of its investment. Here, the increased value would be of dramatic proportions, with an influx of $7,000,000 into a railroad purchased for only $5,000,000. The dis-

shares from Bangor Punta subsequent to the alleged
wrongs and does not deny that it received full value for
its purchase price. No fraud or deceit of any kind is
alleged to have been involved in the transaction.[12] The
equitable principles of *Home Fire* preclude Amoskeag
from reaping a windfall by enhancing the value of its bar-
gain to the extent of the entire purchase price plus an
additional $2,000,000. Amoskeag would in effect have
acquired a railroad worth $12,000,000 for only $5,000,000.
Neither the federal antitrust or securities laws nor the
applicable state laws contemplate recovery by Amoskeag
in these circumstances.[13]

---

sent's suggestion that this substantial infusion of capital, if devoted
to "plant and equipment," would not enhance "earning capacity" or
"balance sheet strength" (*post*, at 725) will come as a surprise to
regulatory bodies, railroad management, and investors.

Respondents have also conceded, both in their brief and at oral
argument, that the present action could not be maintained if
Amoskeag were the real party in interest, or alternatively, if only an
unregulated private corporation were involved. Brief for Respond-
ents 28–29; Tr. of Oral Arg. 19–20.

[12] The dissent's suggestion (*post*, at 723–724) that Amoskeag, a
highly sophisticated investor, was defrauded in the ·purchase trans-
action and that it has suffered an injury is without support in the
record. Not even Amoskeag has ever so asserted, in either the com-
plaint or the briefs, or at oral argument. And in granting the motion
for summary judgment, the District Court expressly observed that
Amoskeag did not contend that it was defrauded in the purchase
transaction. 353 F. Supp., at 726. This statement has since stood
uncontroverted by Amoskeag. In short, prior to the dissent today,
it has never been alleged or suggested that Amoskeag did not acquire
exactly what it bargained for in this transaction.

[13] The dissent makes much of the supposed public interest in rail-
roads and the power of a court of equity to ensure that the public
will actually be benefited by any recovery. *Post*, at 724–725, 727–
730. This argument misses the point. To begin with, the present
action is, in substance, a typical derivative suit seeking an accounting
from the previous controlling shareholder for various acts of corporate
waste and mismanagement. It is settled law that the fiduciary duty

The Court of Appeals further stated that it was important to insure that petitioners would not be immune from liability for their wrongful conduct and noted that BAR's recovery would provide a needed deterrent to mismanagement of railroads. Our difficulty with this argument is that it proves too much. If deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice. No injury or violation of a legal duty to the particular plaintiff would have to be alleged. The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning. Suffice it to say that we have been referred to no authority which would support so novel a result, and we decline to adopt it.[14]

owed by a controlling shareholder extends primarily to those who have a tangible interest in the corporation. Similarly, the recovery provided is intended to compensate, not the public generally, but those who have been injured as a result of a breach of a duty owed to them. In the present case, however, the actual beneficiary of any recovery, Amoskeag, has suffered neither an injury nor a breach of any legal duty. In short, Amoskeag has no cause of action.

The dissent argues that respondents' complaint is based on federal antitrust and securities statutes and that such laws are designed in part to benefit the public. With that much we agree. But the statutory design has not been effectuated through the indiscriminate provision of causes of action to every citizen. Rather, these statutes create specifically defined legal duties to particular plaintiffs and vest the appropriate causes of action in them alone. Here, the statutorily designated plaintiffs are respondent corporations. But, as we have stated, these plaintiffs cannot maintain the present action because a recovery by Amoskeag would violate established principles of equity.

[14] As Dean Pound stated in reply to a similar argument in *Home Fire*:

"But it is said the defendant Barber, by reason of his delinquencies, is in no position to ask that the court look behind the corporation to the real and substantial parties in interest. . . . We do not think such a proposition can be maintained. It is not the function of

We therefore conclude that respondent corporations may not maintain the present action.[15]   The judgment of the Court of Appeals is reversed.

*So ordered.*

---

courts of equity to administer punishment. When one person has wronged another in a matter within its jurisdiction, equity will spare no effort to redress the person injured, and will not suffer the wrong-doer to escape restitution to such person through any device or technicality. But this is because of its desire to right wrongs, not because of a desire to punish all wrong-doers. If a wrong-doer deserves to be punished, it does not follow that others are to be enriched at his expense by a court of equity. A plaintiff must recover on the strength of his own case, not on the weakness of the defendant's case. It is his right, not the defendant's wrong-doing, that is the basis of recovery. When it is disclosed that he has no standing in equity, the degree of wrong-doing of the defendant will not avail him." 67 Neb., at 673, 93 N. W., at 1035.

[15] Our decision rests on the conclusion that equitable principles preclude recovery by Amoskeag, the present owner of more than 99% of the BAR shares. The record does not reveal whether the minority shareholders who hold the remaining fraction of 1% of the BAR shares stand in the same position as Amoskeag. Some courts have adopted the concept of a pro-rata recovery where there are innocent minority shareholders. Under this procedure, damages are distributed to the minority shareholders individually on a proportional basis, even though the action is brought in the name of the corporation to enforce primary rights. See, *e. g., Matthews* v. *Headley Chocolate Co.,* 130 Md. 523, 536–540, 100 A. 645, 650–652 (1917). In the present case, respondents have expressly disavowed any intent to obtain a pro-rata recovery on behalf of the 1% minority shareholders of BAR. We therefore do not reach the question whether such recovery would be appropriate.

The dissent asserts that the alleged acts of corporate mismanagement have placed BAR "close to the brink of bankruptcy" and that the present action is maintained for the benefit of BAR's creditors. *Post,* at 726. With all respect, it appears that the dissent has sought to redraft respondents' complaint. As the District Court noted, respondents have not brought this action on behalf of any creditors. 353 F. Supp., at 726. Indeed, they have never so contended. Moreover, respondents have conceded that the financial health of the railroad is excellent. Tr. of Oral Arg. 18.

Mr. Justice Marshall, with whom Mr. Justice Douglas, Mr. Justice Brennan, and Mr. Justice White join, dissenting.

This suit, brought by and in the name of respondent railroad and its wholly owned subsidiary, seeks to recover damages for the conversion and misappropriation of corporate assets allegedly committed by petitioners, Bangor Punta and its wholly owned subsidiary, during a period when the latter was the majority shareholder of the railroad. Ordinarily, of course, a corporation may seek legal redress against those who have defrauded it of its assets. And when it does so: "A corporation and its stockholders are generally to be treated as separate entities. Only under exceptional circumstances . . . can the difference be disregarded." *Burnet* v. *Clark*, 287 U. S. 410, 415 (1932). See also *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 442 (1934).

The Court finds such exceptional circumstances here because, in its view, any recovery had by the corporation will be a windfall to Amoskeag, the present owner of approximately 99% of the corporation's stock, which purchased most of that stock from the petitioners, the alleged wrongdoers. The Court therefore concludes that this suit must be barred under the equitable principles set forth in *Home Fire Insurance Co.* v. *Barber*, 67 Neb. 644, 93 N. W. 1024 (1903).

I cannot agree. Having read the precedents relied upon by the majority, I respectfully submit that they not only do not support, but indeed directly contradict the result reached today. While purporting to rely on settled principles of equity, the Court sadly mistakes the facts of this case and the established powers of an equity court. In my view, no windfall recovery to Amoskeag is inevitable, or even likely, on the facts of this case. But even if recovery by respondents would in fact be a wind-

fall to Amoskeag, the Court disregards the interests of the railroad's creditors, as well as the substantial public interest in the continued financial viability of the Nation's railroads which have been so heavily plagued by corporate mismanagement, and ignores the powers of the court to impose equitable conditions on a corporation's recovery so as to insure that these interests are protected. The Court's decision is also inconsistent with prior decisions of this Court limiting the application of equitable defenses when they impede the vindication, through private damage actions, of the important policies of the federal antitrust laws.

I

The majority places primary reliance on Dean Pound's decision in *Home Fire Insurance Co.* v. *Barber, supra.* In that case, *all* of the shares of the plaintiff corporation had been acquired from the alleged wrongdoers after the transactions giving rise to the causes of action stated in the complaint. Since none of the corporation's shareholders held stock at the time of the alleged wrongful transactions, none had been injured thereby. Dean Pound therefore held that equity barred the corporation from pursuing a claim where none of its shareholders could complain of injury.

Dean Pound thought it clear, however, that the opposite result would obtain if *any* of the present shareholders

> "are entitled to complain of the acts of the defendant and of his past management of the company; for if any of them are so entitled, there can be no doubt of the right and duty of the corporation to maintain this suit. It would be maintainable in such a case even though the wrong-doers continued to be stockholders and would share in the proceeds." 67 Neb., at 655, 93 N. W., at 1028.

Cf. *Capitol Wine & Spirit Corp.* v. *Pokrass*, 277 App. Div.

184, 186, 98 N. Y. S. 2d 291, 293 (1950), aff'd, 302 N. Y. 734, 98 N. E. 2d 704 (1951).

The rationale for the distinction drawn by Dean Pound is simple enough. The sole shareholder who defrauds or mismanages his own corporation hurts only himself. For the corporation to sue him for his wrongs is simply to take money out of his right pocket and put it in his left. It is therefore appropriate for equity to intervene to pierce the corporate veil. But where there are minority shareholders, misappropriation and conversion of corporate assets injure their interests as well as the interest of the majority shareholder. The law imposes upon the directors of a corporation a fiduciary obligation to all of the corporation's shareholders, and part of that obligation is to use due care to ensure that the corporation seek redress where a majority shareholder has drained the corporation's resources for his own benefit and to the detriment of minority shareholders.[1] Indeed, minority shareholders would be entitled to bring a derivative action, on behalf of the corporation, to enforce the corporation's right to recover for the injury done to it, if the directors turned down a request to seek relief.[2] And any recovery

---

[1] See generally 3 W. Fletcher, Cyclopedia Corporations § 1012 (1965). Indeed, the failure to exercise reasonable care to seek redress for wrongs done the corporation might well subject the directors to personal liability. See, *e. g., Briggs* v. *Spaulding,* 141 U. S. 132 (1891); *Kavanaugh* v. *Commonwealth Trust Co. of New York,* 223 N. Y. 103, 119 N. E. 237 (1918).

[2] "[Stockholders' derivative suits] are one of the remedies which equity designed for those situations where the management through fraud, neglect of duty or other cause declines to take the proper and necessary steps to assert the rights which the corporation has." *Meyer* v. *Fleming,* 327 U. S. 161, 167 (1946). And it is irrelevant that the shareholders bringing the derivative action own only a small percentage of the total outstanding shares. See *Ashwander* v. *TVA,* 297 U. S. 288, 318 (1936); *Subin* v. *Goldsmith,* 224 F. 2d 753, 761 (CA2), cert. denied, 350 U. S. 883 (1955).

obtained in such an action would belong to the corporation, not to the minority shareholders as individuals, for the shareholder in a derivative action enforces not his own individual rights, but rights which the corporation has. See *Meyer* v. *Fleming,* 327 U. S. 161, 167 (1946); *Ross* v. *Bernhard,* 396 U. S. 531, 538 (1970); *Koster* v. *Lumbermens Mutual Co.,* 330 U. S. 518, 522 (1947).

These elementary principles of corporate law should control this case. Although first Bangor Punta and then Amoskeag owned the great majority of the shares of respondent railroad, the record shows that there are many minority shareholders who owned BAR stock during the period from 1960 through 1967 when the transactions underlying the railroad's complaint took place, and who still owned that stock in 1971 when the complaint was filed.[3] Any one of these minority shareholders would have had the right, during the 1960–1967 period, as well as thereafter, to bring a derivative action on behalf of the corporation against the majority shareholder for misappropriation of corporate assets. As Dean Pound states, such an action could be brought, "even though the wrongdoers continued to be stockholders and would share in the proceeds." 67 Neb., at 655, 93 N. W., at 1028.

It is ironic, then, to see the Court adopt a result which bars the corporation itself from bringing a suit which a minority shareholder could have brought in the corporation's behalf. And it is peculiar, to say the least, that the law should prevent the directors of BAR from fulfilling the fiduciary obligation to minority shareholders which the law devolves upon them. Such a result not only cannot be derived from *Home Fire,* but is directly in conflict with its holding.

---

[3] According to the complaint, there were 20 individual minority shareholders, many of whom acquired their shares in the 1950's. App. 6–7, 22–23.

## II

Even assuming, however, that the equitable principles of *Home Fire* should be extended to the situation where the present majority shareholder does not own all the outstanding shares, there are other features distinguishing this case from *Home Fire* and calling for the recognition of the railroad's right to maintain this action. To begin with, it is not at all clear from the record that any recovery had by the railroad will in fact be a windfall to Amoskeag, its present majority shareholder.

The Court relies principally on its own observation that Amoskeag was not defrauded or deceived in its transaction with petitioners, that it received full value for its money, and that it has received no injury whatsoever. See *ante,* at 711. The record, in my view, simply will not support these "findings." That there is no specific allegation in the complaint that Amoskeag was deceived or otherwise injured by petitioners is understandable, since this lawsuit is not brought by Amoskeag, but rather by respondent railroad in its own name.

Furthermore, a fair reading of the complaint indicates that Amoskeag most likely has suffered injury. The causes of action relate primarily to transactions involving the railroad and its former majority stockholder between 1960 and 1967. Amoskeag purchased its shares from petitioners on October 2, 1969, after these events. But nowhere in the record is there any concession that, at the time of its purchase, Amoskeag was fully aware of the misuses of corporate assets alleged in the complaint. To the contrary, the complaint asserts that at the time of Amoskeag's purchase, the Interstate Commerce Commission's Bureau of Accounts was in the middle of an investigation into the relationship between the railroad and its majority shareholder. Its report, not made public until July 1971, laid bare for the first time the wrongful

intercorporate transactions that are the subject of the present suit and recommended that legal remedies be explored to require petitioners to pay back to the carrier assets taken without compensation and charges made where no services were performed. The plain import of the complaint is that Amoskeag did not know of these wrongful transactions prior to public disclosure of this report. In fact, an introductory paragraph of the complaint alleges: "All wrongs hereinafter complained of were discovered by BAR's new management's investigation of all facets of the inter-corporate relationships and were not previously known to the new BAR management." App. 6. At this stage in the litigation, such allegations must be accepted as true, the District Court having dismissed the suit without inquiring into the truth of any of its claims. There is accordingly no basis in the record for presuming that Amoskeag was not the victim of any deception.

But even assuming that Amoskeag received close to full value for its money, it is by no means inevitable that any recovery obtained by the railroad will inure to Amoskeag's benefit, rather than to the benefit of the corporation, its creditors, and the public it aims to serve. The Court makes much of the supposed lack of power of a court of equity to impose limitations on the use BAR might make of the recovery. *Ante,* at 715. "Traditionally," however, "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955). "A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." *SEC* v. *United States Realty & Improvement Co.,* 310 U. S. 434, 455

(1940).[4]  Indeed, if there be any doubt as to the power
of a court of equity, BAR informed the District Court
that the railroad would voluntarily enter into a stipula-
tion to ensure that any recovery would be reinvested in
the railroad, for upgrading the right-of-way and for new
equipment, and that Amoskeag would voluntarily join
the stipulation if requested.  Brief for Respondents 30.

Improved equipment and rights-of-way, of course,
might benefit Amoskeag indirectly by increasing to some
extent the value of its equity.  But such expenditures
would hardly bring a dollar-for-dollar increase in the
price Amoskeag would receive if it were to sell its stock.
The value of a solvent railroad's stock is determined by
many factors—earning capacity; historical income, ex-
cluding nonrecurring items; balance sheet strength; divi-
dend history; and condition of plant and equipment.
Under an appropriate decree, only the last of these fac-
tors would be enhanced by the railroad's recovery.  It
is therefore not inevitable that any recovery had by the
railroad would benefit its current majority shareholder
and there is no basis, in any event, for deeming such a
benefit a windfall.

### III

But let us assume that the majority is correct in find-
ing some windfall recovery to Amoskeag inevitable in
this case.  This is still but one of several factors which a
court of equity should consider in determining whether

---

[4] It is interesting to note that the majority's restrictive notions as
to the power of a court of equity to direct the application of a re-
covery are in conflict with the majority's own suggestion for protect-
ing the interests of innocent minority shareholders.  See *ante*, at 718
n. 15.  If a court of equity lacks power to direct a corporation to
apply the proceeds of a recovery in any particular fashion, how can
the court direct the corporation to distribute a pro-rata recovery to
some, but not all, of its shareholders?

the public interest would best be served by piercing the corporate veil in order to bar this action. The public interest against windfall recoveries is no doubt a significant factor which a court of equity should consider. But in this case it is clearly outweighed by other considerations, equally deserving the recognition of a court of equity, supporting the maintenance of the railroad's action against those who have defrauded it of its assets.

Equity should take into account, for example, the railroad's relationships with its creditors. BAR owes a debt of approximately $23 million, indicating almost 90% debt ownership of the enterprise. App. 7. If the allegations of the complaint are true, the conversion and misappropriation of corporate assets committed by petitioners placed the railroad close to the brink of bankruptcy, to the certain detriment of its creditors. The complaint alleges that net revenue in 1970 was a loss of approximately $1.3 million. *Id.*, at 5. And one of the specific causes of action in the complaint is that Bangor Punta procured the declaration by BAR of a dividend which was unlawful under a mortgage bond indenture due to insufficient working capital. *Id.*, at 15–18.

Surely the corporation, as an entity independent of its shareholders, has an interest of its own in assuring that it can meet its responsibility to its creditors. And I do not see how it can do so unless it remains free to bring suit against those who have defrauded it of its assets. The Court's result, I fear, only gives added incentive to abuses of the corporate form which equity has long sought to discourage—allowing a majority shareholder to take advantage of the protections of the corporate form while bleeding the corporation to the detriment of its creditors, and then permitting the majority shareholder to sell the corporation and remain free from any liability for its wrongdoing.

More importantly, equity should take into account the public interest at stake in this litigation. As the Court of Appeals indicated:

> "The public's interest, unlike the private interest of stockholder or creditor, is not easily defined or quantified, yet it is real and cannot, we think, be overlooked in determining whether the corporation, suing in its own right, should be estopped by equitable defenses pertaining only to its controlling stockholder." 482 F. 2d 865, 868 (CA1 1973).

The public's interest in the financial health of railroads has long been recognized by this Court:

> "[R]ailways are public corporations organized for public purposes, granted valuable franchises and privileges, among which the right to take the private property of the citizen *in invitum* is not the least, . . . many of them are the donees of large tracts of public lands and of gifts of money by municipal corporations, and . . . they all primarily owe duties to the public of a higher nature even than that of earning large dividends for their shareholders. The business which the railroads do is of a public nature, closely affecting almost all classes in the community . . . ." *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 332–333 (1897).

The same public interest has been recognized in a wide variety of legislative enactments. As early as the Transportation Act of 1920, "Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers is a matter of national concern . . . ." *Texas & Pacific R. Co.* v. *Gulf, C. & S. F. R. Co.,* 270 U. S. 266, 277 (1926). Later,

Congress added § 77 to Chapter VIII of the Bankruptcy Act, providing that financial reorganization of ailing railroads should be achieved for the benefit of the public, and not simply in the interests of creditors or stockholders. See *New Haven Inclusion Cases,* 399 U. S. 392, 492 (1970).

The significance of the public interest in the financial well-being of railroads should be self-evident in these times, with many of our Nation's railroads in dire financial straits and with some of the most important lines thrown into reorganization proceedings. Indeed, the prospect of large-scale railroad insolvency in the Northeast United States was deemed by Congress to present a national emergency, prompting enactment of the Regional Rail Reorganization Act of 1973, Pub. L. 93–236, 87 Stat. 985 (1974), in which the Federal Government, for the first time, committed tax dollars to a long-term commitment to preserve adequate railroad service for the Nation. As the Court of Appeals held, given this background, "it would be unrealistic to treat a railroad's attempt to secure the reparation of misappropriated assets as of concern only to its controlling stockholder." 482 F. 2d, at 870. "[T]he public has a real, if inchoate, interest" in this action. *Id.,* at 871.

The Court gives short shrift, however, to the public interest. While recognizing that respondents' complaint is based primarily on federal antitrust and securities statutes designed to benefit the public, and while conceding that the statutorily designated plaintiffs are respondent corporations, the Court nevertheless holds that these plaintiffs cannot maintain this action because any recovery by Amoskeag would violate established principles of equity. *Ante,* at 716–717, n. 13. I cannot agree, for the public interest and the legislative purpose should always be heavily weighed by a court of equity. As this Court

has frequently recognized, equity should pierce the corporate veil only when necessary to serve some paramount public interest, see *Schenley Corp.* v. *United States,* 326 U. S. 432, 437 (1946); *Anderson* v. *Abbott,* 321 U. S. 349, 362 (1944), or "where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." *New Colonial Ice Co.* v. *Helvering,* 292 U. S., at 442. Here, however, it is the failure to recognize the railroad's own right to maintain this suit which undercuts the public interest.

The Court's result substantially impairs enforcement of the state and federal statutes upon which the railroad bases many of its claims. For example, § 10 of the Clayton Act, 15 U. S. C. § 20, relied on in two substantial counts of the complaint, provides:

> "No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce . . . to the amount of more than $50,000, in the aggregate, in any one year, with another corporation . . . when the said common carrier shall have upon its board of directors or as its president . . . any person who is at the same time a director [or] manager . . . of . . . such other corporation . . . unless . . . such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding . . . ."

As we have earlier had occasion to note, § 10 is not an ordinary corporate conflict-of-interest statute, but is part of our Nation's antitrust laws, specifically designed to protect common carriers such as railroads. See *United States* v. *Boston & Maine R. Co.,* 380 U. S. 157 (1965); *Minneapolis & St. Louis R. Co.* v. *United States,* 361 U. S. 173, 190 (1959). The purpose of § 10 "was to prohibit a

corporation from abusing a carrier . . . through over-reaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest." 361 U. S., at 190.

The private causes of action brought by respondent railroad under § 10 serve to vindicate this important congressional policy. See *Klinger* v. *Baltimore & Ohio R. Co.*, 432 F. 2d 506 (CA2 1970). And by barring this suit, notwithstanding the plain allegations in the complaint that the carrier as well as the public interest it serves were injured through violations of this section committed by petitioners,[5] the Court directly frustrates the ends of Congress. Indeed, the Court encourages the very kind of abuses § 10 was designed to prohibit. The majority shareholder of a carrier can convert and misappropriate its assets through improper intercorporate transactions, with the "consequent impairment of its ability to serve the public interest," and then wash its hands of and remain free from any legal liability for its statutory violation by selling off its interest.[6]

---

[5] The complaint alleges that the special and illegal dividends which petitioners caused BAR to declare "served to deprive plaintiff BAR of a source of cash which could and would have been utilized for necessary maintenance and equipment acquisitions and replacements, all to the injury of BAR and the public which it serves." App. 16.

[6] These arguments are applicable as well to the causes of action stated under § 104 of the Maine Public Utilities Act, Maine Rev. Stat. Ann., Tit. 35, § 104 (1965), which provides in pertinent part:

"No public utility doing business in this State shall . . . make any contract or arrangement, providing for the furnishing of . . . services . . . with any corporation . . . owning in excess of 25% of the voting capital stock of such public utility . . . unless and until such contract or arrangement shall have been found by the commission

I would find counsel instead in this Court's opinion in *Perma Life Mufflers* v. *International Parts Corp.*, 392 U. S. 134, 138–139 (1968). The Court took note in that case that "[w]e have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." As we recognized,

> "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement."

These principles have even greater force here, since Amoskeag, "whatever its own lack of equity, is neither a

not to be adverse to the public interest and shall have received their [*sic*] written approval."

While different from § 10 of the Clayton Act in certain details (applying to all public utilities rather than only to carriers, and relying on the supervision of an administrative agency rather than the device of competitive bidding), the Maine statute clearly has the same underlying purpose: to protect the public interest from abuses of public utilities through intercorporate transactions with a major shareholder. While Maine law governs the causes of action under this section and the courts of Maine have, in other cases, accepted the general equitable principle that a stockholder has no standing to sue if he or his vendor participated in the wrong, see *ante*, at 714, there is no basis in Maine law for applying this equitable doctrine where the direct result is to leave remediless the very abuses § 104 was designed to prohibit.

wrongdoer nor a participant in any wrong." 482 F. 2d, at 870–871.

In the final analysis, the Court's holding does a disservice to one of the most settled of equitable doctrines, reflected in the maxim that "[e]quity will not suffer a wrong without a remedy." *Independent Wireless Tel. Co. v. Radio Corp. of America,* 269 U. S. 459, 472 (1926). Because I would follow that maxim here and permit respondent railroad to maintain this action to seek redress for the wrongs allegedly done to it and to the public interest it serves, I respectfully dissent.