548 A.2d 813

**Steven D. ETTRIDGE**

v.

**TSI GROUP, INC., Wesley D. Ettridge.**

**No. 47, Sept. Term, 1986.**

Court of Appeals of Maryland.

Oct. 20, 1988.

34

Karen L. Aldridge (Jone Lemos Jackson and Piper & Marbury), Washington, D.C., for appellant.

Ronald G. Kronthal (David C. Gardner and Gimmel, Weiman & Savitz, P.A., on the brief), Gaithersburg, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH,* McAULIFFE and ADKINS, JJ.

McAULIFFE, Judge.

The owner of forty-nine percent of the common stock of a corporation seeks dissolution of the entity, claiming illegal, oppressive, or fraudulent conduct on the part of those in control of the corporation. The majority stockholder and the corporation resist this effort, contending among other things that the suit is barred because the action was brought with an improper motive, and because the minority stockholder may not introduce evidence of any wrongdoing that antedated his acquisition of his interest in the corporation. To complicate matters, internecine warfare rages just beneath the surface of this corporate controversy. The minority stockholder is the son of the majority stockholder, who has been embroiled in divorce proceedings with the minority stockholder's mother. According to the son, his father has manipulated the corporation to conceal assets, to deprive his wife of her financial due, and to favor his alleged girlfriend. According to the father, the son ac-

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

quired his stock and brought this action solely for spite and retribution. Moreover, says the father, the person from whom the son acquired his stock was a willing participant in the corporate activities about which the son now complains, and because the predecessor stockholder would have been estopped to complain, so also is the successor to that interest.

## I.

The minority stockholder is Steven D. Ettridge (Steven). The majority stockholder is Wesley D. Ettridge (Wesley), Steven's father. The corporation is TSI Group, Inc. (TSIG). Wesley's estranged wife, and mother of Steven, is Evelyn Ettridge (Evelyn).

In the mid–1960's, Wesley and Evelyn established a temporary office staffing company known as Executive Staffing, Inc. (ESI). Wesley owned fifty-one percent of the common stock of ESI, and Evelyn owned the remainder. By 1982, this successful business was being conducted through Diversified Business Systems, Inc. (DBS), a wholly owned subsidiary of ESI.

In 1981, divorce proceedings between Wesley and Evelyn were begun in Virginia. Steven claims that shortly thereafter his father embarked upon a series of actions designed to conceal assets from the domestic relations court, to wrongfully dilute Evelyn's interest in ESI, to diminish the value of her holdings, and to provide the father with hidden income diverted from the family business. To explain the involvement of TSIG, and for a general understanding of the legal principles involved, we set forth certain of the facts alleged by Steven.[1]

According to Steven, Wesley formed TSIG in 1984. Although all of the common stock of TSIG was issued to Katherine Collins (who was then president of DBS and ESI),

---

1. Wesley has not yet had an opportunity to offer evidence in opposition to Steven's allegations.

there was a secret oral understanding between Collins and Wesley that upon demand Collins would transfer to Wesley at least fifty percent of the stock of TSIG. This arrangement allowed Wesley to deny any ownership interest in TSIG while the divorce proceedings continued. Wesley then arranged to have DBS issue 400 shares of stock (in addition to the 200 shares previously issued, and owned by ESI), which were sold to TSIG for $60,000. The funds for the purchase of the new DBS stock were obtained through a bank loan, which Wesley and Collins co-signed. Steven contends that this loan has been paid with funds taken from DBS.

Steven also claims that $129,000 belonging to either DBS or TSIG was then diverted to MBA Temporaries, Inc. (MBA), an unaffiliated temporary services company in Virginia, without any arrangement for repayment. The stock of MBA is owned by Mary Gardner, alleged girlfriend of Wesley, who has no experience in the temporary placement business. Gardner bought the MBA stock with a downpayment of $5,000 and a promise of monthly payments. Steven says MBA promptly repaid Gardner the $5,000 she gave as a downpayment, using DBS corporate funds which had been diverted to MBA. Steven further contends that DBS also paid Gardner's monthly obligations for the purchase of that stock. Moreover, MBA has sent "salary" or "dividend" checks of $2,500 per month to Gardner, who turned the money over to Wesley. To make up the shortfall in MBA caused by these payments, DBS and TSIG funds were improperly diverted to MBA. Steven says that Wesley stands to profit from this preferential treatment of MBA because he has an ongoing option to purchase all the shares of MBA stock from Gardner for $5,000.

Steven also contends that in 1984 Wesley set up a sham sale of his ESI stock to TSIG, in order to skim assets from TSIG without generating any record of payment of salary or dividends to him. Wesley "sold" his ESI stock to TSIG for $26,000, receiving $5,000 down and the balance to be paid to him in monthly payments. Wesley received six

payments of $693.75, the amount needed by him to make his alimony payments. He then arranged for TSIG to "default" in its payments, and he demanded and received the return of his stock from TSIG without returning any part of the $9,162.50 TSIG had paid to him.

Steven claims that Wesley has also caused TSIG to enter into an agreement which could, on short notice, reduce the corporation to a shell. He did this by having TSIG pledge to Gardner the 400 shares of DBS it owns, as security for a demand note of $25,000 given by TSIG to Gardner for a loan. Thus, says Steven, Wesley and Gardner have set the stage for Gardner's quick take-over of the major asset of TSIG by having Gardner demand payment, TSIG default, and Gardner buy the hypothecated DBS stock at a forced sale.

Steven also generally claims that TSIG funds have been diverted to other corporations controlled by Wesley, or in which Wesley has an interest; that TSIG funds are used to pay employees of unaffiliated corporations; that excessive salaries are being paid to employees willing to participate in the transactions orchestrated by Wesley; that TSIG has undertaken the payment of more than $250,000 in employee withholding taxes owed by other corporations; and, that TSIG is delinquent in the payment of its own employment taxes. Finally, Steven says that TSIG has refused to permit him to inspect and copy the corporation's books and accounts as is his right under § 2–513 of the Corporations and Associations Article of the Maryland Code (1975, 1985 Repl.Vol.)

On May 31, 1985, Steven filed a complaint in the Circuit Court for Montgomery County for dissolution of TSIG, alleging illegal, fraudulent, and oppressive acts by those in control of the corporation.[2] Steven also sought interlocu-

2. Section 3–413(b)(2) of the Corporations and Associations Article, Md. Code (1975, 1985 Repl.Vol.) provides that "[a]ny stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that

tory relief, including the immediate appointment of a receiver and an injunction to prohibit the officers of the corporation from further diluting the interest of the stockholders, diverting corporate funds for their own use or the use of others, or wasting corporate assets. TSIG answered, denying that any acts had taken place which would justify granting the relief sought by Steven. More important for the purposes of this appeal, TSIG said that Steven had no standing to seek relief because 1) he was not a stockholder at the time of the wrongs alleged, and 2) he acquired his stock from Collins, who was a knowing participant in the wrongs alleged.

A hearing on Steven's request for interlocutory relief was conducted by Judge James McKenna. On the second day of the hearing, Judge McKenna interrupted the presentation of Petitioner's case and invited argument from counsel on Respondent's assertion that even if the allegations of misconduct were true, Steven did not have standing to complain. Steven argued that his statutorily grounded claim for dissolution was not subject to the requirement of contemporaneous ownership or defenses of estoppel which might have been applicable to common law actions for damages. Furthermore, he argued, there was sufficient evidence of continuing illegal, oppressive, or fraudulent conduct to justify the granting of relief, even if he were precluded from relying on the earlier acts for any purpose other than giving color or meaning to the acts that had occurred since he acquired his stock. The trial judge, without receiving additional evidence, entered an order denying Petitioner's request for interlocutory relief. In a brief oral opinion, Judge McKenna said he assumed for the purpose of disposition that the evidence concerning acts which occurred before Steven obtained his stock would show fraud. He held, however, that Steven lacked standing to complain about those antecedent acts. Steven proffered

---

... [t]he acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."

that his evidence would show new and continuing fraudulent acts by those in control of the corporation, occurring after Steven's acquisition of the stock. Judge McKenna refused to receive evidence in support of this proffer, stating that even if such facts were proven they would not alter the result. Steven appealed from the order denying interlocutory relief, and we granted certiorari prior to consideration of this matter by the Court of Special Appeals.

## II.

Before discussing in greater depth the substantive issues involved, we address the procedural question raised by Respondent's motion to dismiss the appeal. Respondent contends that an order denying interlocutory relief is not appealable. That statement, while perhaps useful as a general rule of thumb, is too broad.

■ Generally, an appeal is allowed only from a final judgment. Courts and Judicial Proceedings Article, § 12–301, Maryland Code (1974, 1984 Repl.Vol., 1987 Cum. Supp.). There are a number of exceptions to the general rule, however, including statutory exceptions which deal expressly with appeals from interlocutory orders. Section 12–303(3)(iii) of the Courts and Judicial Proceedings Article permits an appeal from an interlocutory order refusing to grant an injunction. Judge McKenna's denial of all requested interlocutory relief necessarily included a denial of the request for an interlocutory injunction, and to that extent the order is immediately appealable.

■ Respondent contends that even if Petitioner may appeal from so much of the order as denied injunctive relief, he may not now appeal from the interlocutory refusal to appoint a receiver. Respondent is correct. Section 12–303(3)(iv) permits an appeal from an interlocutory order appointing a receiver (provided the appellant has first filed an answer to the complaint), but grants no concomitant right of appeal from an interlocutory order refusing to appoint a receiver. Respondent further suggests that be-

cause the circuit court's refusal to appoint a receiver cannot now be appealed, we should make it clear that that decision cannot be changed even if we should reverse and remand on the question of the issuance of an interlocutory injunction. We disagree. For the very reason that the order denying appointment of a receiver is interlocutory, it is subject to change by the circuit court. *Banegura v. Taylor,* 312 Md. 609, 618–19, 541 A.2d 969 (1988). Upon remand, should further proceedings indicate the necessity of the appointment of a receiver before a final hearing can be held, the circuit court would be free to reverse its earlier decision and grant that relief.

## III.

Turning to the substantive issues, we first note that this appeal does not involve a claim of abuse of discretion. The trial judge's determination to deny interlocutory injunctive relief was based upon his belief that, as a matter of law, Steven lacked standing to bring the action.

In making this determination, the trial judge considered two separate but related principles. The first, generally known as the contemporaneous ownership rule, provides that a purchaser of stock ordinarily cannot complain of the prior acts and management of the corporation. The second is that stockholders who have acquired their interest in the corporation from those who participated in, or acquiesced in, the alleged mismanagement have no standing to complain thereof.

The rule of contemporaneous ownership was announced by the United States Supreme Court in *Hawes v. Oakland,* 104 U.S. 450, 461, 26 L.Ed. 827 (1882). There, the Court held that it was necessary to allege in any derivative action "that the complainant was a stockholder at the time of the transactions of which he complains, or that his shares have devolved upon him since by operation of law." This rule has been codified in federal practice at Fed.Rule Civ.Proc. 23.1(1), and has been followed by most of the states. *See*

*Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 708–09, 94 S.Ct. 2578, 2581–82, 41 L.Ed.2d 418 (1974). *See generally Eisler v. Eastern States*, 182 Md. 329, 335–36, 35 A.2d 118 (1943); *Matthews v. Headley Chocolate Co.*, 130 Md. 523, 531–32, 100 A. 645 (1917); and *Home Fire Ins. Co. v. Barber*, 67 Neb. 644, 93 N.W. 1024, 1028–29 (1903). The principal considerations supporting the rule are these: 1) a stockholder bringing suit after acquiring his shares has sustained no injury because he received what he paid for; 2) to permit such an action would result in a windfall to the subsequent stockholder; and, 3) permitting such action would allow the stockholder to reap a profit from wrongs done to others, thus furthering such speculation. *Bangor Punta, supra*, 417 U.S. at 711, 94 S.Ct. at 2583.

■ The second principle, precluding suit by those who acquired their shares from one who participated or acquiesced in the allegedly wrongful transactions, is grounded not only in the same considerations as the first, but also in the equitable doctrine of unclean hands—"he that hath committed iniquity shall not have equity." *2 Pomeroy's Equity Jurisprudence* 90 (5th ed. 1941). A purchaser of stock generally acquires the rights that his transferor had. Thus, the purchaser ordinarily stands in the shoes of his predecessor in title, and if the predecessor's suit would be barred by the application of equitable principles, so also is the purchaser's suit.[3]

Concerning the relevance of these principles to the case at hand, Steven makes the point that the principles are intended to apply only to derivative stockholder actions. He says that in a statutory action for dissolution, neither the

---

**3.** Steven does not contend that he was a bona fide purchaser of his stock, within the meaning of § 8–302 of the Commercial Law Article, Md. Code (1975, 1988 Cum.Supp.). Nor does he contend that if he were, that status would shield him from the application of this equitable principle.

considerations underlying the rules nor the rules themselves should apply.

■ Considerations of an improper windfall, or of profiting from wrongs done to others, are essentially lacking where the suit is to dissolve the corporation and there is no claim for damages. However, as we pointed out earlier, these were not the only reasons for the development of the principles. The unclean hands doctrine is fully applicable here. To allow Steven to bring about the dissolution of this corporation based solely on acts done prior to his acquisition of the stock would be tantamount to allowing Collins to cause the death of the corporation by reason of her own acts, or acts in which she was *in pari delicto*. Moreover, even though a direct windfall will not result from a successful action for dissolution, we believe the earlier concern about improper speculation in stock continues to have vitality here. If any person having knowledge of illegal, oppressive, or fraudulent acts by the management of a corporation may bring an action for the dissolution of that corporation simply by obtaining a share of its stock, the threat of disruptive and extortionate litigation becomes all too real.

■ We conclude, then, that these common law equitable principles have a place, and ought to be considered, in actions of this kind. We emphasize, however, that they are equitable principles, and not inflexible rules of law. They are to be applied on a case-by-case basis, having due regard for the reasons for their existence and the equitable goals they were designed to attain. As the General Assembly said in repealing a section of the Maryland Code that had at one time codified the rule of contemporaneous ownership:

> Section 240A is unnecessary, and may even prove unjust and inequitable in some cases, inasmuch as the proper balancing of the equities in cases of this type can be achieved only in the light of the particular set of facts of each case, and not through a rigid rule of law incorporated into the statute. . . .

Chapter 136, Laws of Maryland, 1951.

■ On the facts, of the instant case, it may well be that Judge McKenna was correct in holding that Steven should not be permitted to bring about the dissolution of this corporation solely on the basis of acts occurring before his acquisition of the stock, and in which his predecessor in title participated or acquiesced. We think the trial judge erred, however, in concluding that Steven could not rely upon continuing or subsequent illegal, oppressive, or fraudulent acts in support of his claim for relief. The sound reasons which underlie the principles we have discussed simply have no application to acts occurring after the stock has been acquired. A stockholder is not forever precluded from taking effective action because his predecessor in title had acquiesced in acts similar to those that may now be laying waste to the corporation.

■ Moreover, we think that evidence of prior misconduct, while unavailable to Steven as a basis for relief, may be relevant and admissible to give color and meaning to evidence of current misconduct. *See Lawson v. Baltimore Paint and Chemical Corporation,* 298 F.Supp. 373 (D.C. Md.1969) (in derivative action, evidence of transactions occurring before plaintiff obtained stock may be admissible to show the origin and cause of the alleged plan and conspiracy).

■ We now discuss two additional areas of concern that are likely to arise on remand. The first involves the treatment of evidence relating to a continuing wrong. When a stockholder buys his stock after certain wrongs have been committed, but before the full impact of those wrongs has been felt, or the stockholder buys in the midst of a series of on-going wrongs, how much of the wrongful conduct may be considered as a basis for relief? Unfortunately, no bright-line rule may be established that would fit the variety of fact situations which will arise. We generally agree, however, with the observation of the Court of Chancery of Delaware in *Schreiber v. Bryan,* 396 A.2d 512, 516 (Del.Ch.1978), that "what must be decided is when the

specific acts of alleged wrongdoing occur, and not when their effect is felt." We add, however, that where a pattern of misconduct is continuing, those specific acts occurring after the date of acquisition may be considered. A more difficult question arises in the case of an on-going scheme that does not involve new specific acts of misconduct, but which might be halted without interfering with the rights of innocent persons. In those situations, we think a trial judge may be justified in treating the wrong as a continuing one.

■ The second question we address for guidance involves the legal effect to be given to the motive of the stockholder bringing the action. TSIG argues that Steven's suit should be barred because his motive in acquiring the stock and in bringing the action was to punish his father, and that it is obvious he has no concern for what is best for the corporation. Steven did not testify concerning his motive, nor did Judge McKenna make any finding on that question. The decisions are split on the question of the effect to be given to the motive of the moving party. *See generally*, 12b Fletcher, *Cyclopedia of the Law of Private Corporations*, §§ 5877–79 (1984 rev. vol.). We conclude that Steven's motive may be an appropriate factor for consideration, along with all other relevant factors, in determining whether or to what extent relief should be granted. Although an improper motive is not, *per se*, a bar, we see no reason why a trial judge should be precluded from including this factor along with all other relevant considerations in the exercise of the wide discretion given him in an equity action of this type.

ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY DENYING INTERLOCUTORY INJUNCTIVE RELIEF VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE, TSI GROUP, INC.