## BRANIFF AIRWAYS, INC.

v.

## The LTV CORPORATION.

Civ. A. No. 3–77–0329–G.

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 19, 1979.

---

Ethan B. Stroud, Dan McElroy, Cameron Dee Sewell, M. J. Vanden Eykel, Stroud & Smith, Dallas, Tex., Alan R. Bromberg, Jenkins & Gilchrist, Dallas, Tex., for plaintiff.

Michael V. Powell, Morris Harrell, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for defendant; J. J. Karl, Asst. Gen. Counsel, The LTV Corp., Dallas, Texas, of counsel.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

### I.

This action by Braniff Airways, Inc. ("Braniff") against The LTV Corporation ("LTV") seeking damages for alleged securities fraud, breach of contract, and corporate mismanagement—now before the court on LTV's motion for partial summary judgment—has its genesis in a rather complex series of corporate maneuvers, a summary of which is prerequisite to an understanding of the legal issues presented.

In December, 1965, Greatamerica Corporation ("GA") owned approximately 80.9% of Braniff's outstanding stock. For that month, the following two calendar years, and from January 1 through March 17, 1968, Braniff's federal income taxes were reported on consolidated income tax returns for a group of corporations of which GA was the parent. In tax returns pertaining to the calendar year 1967 and for the period from January 1, 1968 through March 17, 1968, the GA group of companies used $8,087,542 in investment tax credits generated by Braniff. The remaining tax liability of the GA group was then allocated among the corporations in the group in accordance with the percentage of the taxable income of the group that was contributed by each corporation.

During the latter part of this period, GA was being acquired by LTV (then and until May 5, 1972 known as Ling-Temco-Vought, Inc.) through an exchange offer made by LTV to GA shareholders. The exchange offer had its inception in an August 4, 1967 Memorandum of Understanding and Agreement entered into by GA and LTV; the offer was successful, and LTV owned more than 80% of GA stock on March 17, 1968, and more than 95% of GA stock by April 1, 1968.

Sometime in 1967 or 1968, GA and then LTV made an agreement with Braniff providing for the restoration to Braniff of the $8,087,542 in investment tax credits generated by Braniff and used in the GA group tax returns. This agreement is the seed that has spawned this litigation. The nature and terms of the agreement are in dispute, LTV contending that the agreement is embodied solely in written instruments, Braniff contending that the agreement was oral, and both parties disagreeing as to other terms of the agreement, including the conditions necessary to trigger LTV's repayment obligation. It is agreed, however, that repayment was to be made to Braniff only if and when "Braniff could otherwise have used such credits on its Federal Income Tax Returns, just as if such credits had not previously been claimed and used by Greatamerica Corporation." (Answer to Interrogatory 1(b)(iv) of Defendant's First Interrogatories to Plaintiff).

From March 17, 1968 through November 27, 1968, LTV owned more than 80% of Braniff's outstanding stock. During this period, Braniff was a member, for federal income tax purposes, of a consolidated group of corporations of which LTV was the parent, and Braniff's tax liability for this period was determined after allowing Braniff a credit of $3,465,386 for investment tax credits generated by it. This amount was deducted from the amount of investment tax credits subject to the reimbursement agreement, leaving $4,622,156 unpaid.

In October, 1968, LTV made the first of a series of public offerings of Braniff stock that resulted in reduction of its ownership of Braniff to only 32.6% in April, 1971, 12.1% in May, 1971, and ended in complete divestment by LTV of its interest in Braniff by August 2, 1971.

On November 28, 1973, a holding company named Braniff International Corporation acquired all of the outstanding shares of Braniff. From that date, and continuing until the present, Braniff International has owned all Braniff shares.

Braniff alleges in its complaint that in or about July, 1976, it "determined that it could have used the investment tax credits in the years 1972 and 1973 had they not previously been used by Defendant, on its own behalf and as successor to Greatamerica, as permitted under the IRC." (First Amended Complaint, p. 6). Braniff then demanded that LTV reimburse it the remaining $4,622,156 allegedly owed under the reimbursement agreement. Upon LTV's refusal, Braniff initiated this lawsuit.

The first amended complaint sets forth eight grounds of recovery, only two of which are rooted in federal law. There being no diversity of citizenship between the parties, jurisdiction over the state law claims is asserted to exist under the doctrine of pendent jurisdiction.

Counts one and two seek relief under the antifraud provisions of the federal securities laws—section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5 promulgated pursuant thereto, and section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q. Jurisdiction of these claims is under section 27 of the 1934 Act and section 22(a) of the 1933 Act. Count three is brought under section 33 of the Securities Act of Texas, Tex.Civ.Stat.Ann. art. 581–33 (Vernon Supp.1977), and counts four, five, and six are brought under the common law of Texas, alleging, respectively, breach of contract, anticipatory breach of contract, and breach of fiduciary duty. Under count seven Braniff seeks an accounting and imposition of a constructive trust under the common law of Texas, and under count eight Braniff seeks to recover

under a common law claim of unjust enrichment.

On February 15, 1979, after nearly two years of discovery, LTV moved for summary judgment on all but counts four and five of the amended complaint. The motion attacks the complaint from three angles. The thrust of the attack is directed at the securities fraud claims and the principal weapon is LTV's argument that Braniff purchased no "security" within the meaning of the federal or state securities laws. In addition, LTV argues that these claims are barred by limitations. Finally, LTV urges that Braniff is barred from asserting its claims of securities fraud, breach of duty, and unjust enrichment and its claims for an accounting by virtue of the rule of contemporaneous ownership and the doctrine of "tainted shares," deriving principal support for this argument from the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & Arrostook Railroad Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974).

The jurisdictional cornerstones of Braniff's complaint are its claims under the federal securities laws; if these claims fall at this stage, this court ought not exercise pendent jurisdiction over the related state law claims. As noted above, the primary attack upon the federal claims is LTV's argument that Braniff did not purchase "securities" within the meaning of the 1933 and 1934 Acts. It is to this contention that the court now turns.

## II.

Braniff contends that in transferring or contributing more than $8 million of investment tax credits to the GA group it "purchased at least two 'securities': (1) a percentage or interest in the consolidated tax return and tax management plan first of Greatamerica and then of LTV; and, (2) an obligation by Greatamerica and LTV to compensate Braniff in an amount equal to the ITCs [investment tax credits] taken from Braniff and used by Greatamerica and LTV at a later date." (Brief of Braniff in Opposition to Defendant's Motion for Partial Summary Judgment, p. 13). According to Braniff, these items together constitute an "investment contract"—"security," while the second item is an "evidence of indebtedness" or "investment obligation"—"security."

Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines a "security" as

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The definition of a "security" in section 3(a)(10) of the Securities Exchange Act of 1934 is virtually identical to that in the 1933 Act, and the Supreme Court has on several occasions considered the coverage of the two Acts the same. *See International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). This court will find the coverage of the two Acts for purposes of this case to be identical insofar as the definition of "security" is concerned.

As is apparent from the quoted language of the statute, Congress did not attempt to identify with precision what among the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *SEC v. W. J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), falls within the protection of the federal securities laws. Nor did Congress provide a test by which such a determination was to be made,

though the legislative history contains the oft-quoted but only marginally helpful statement that the Securities Acts were intended to cover "the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.Rep.No. 85, 73d Cong., 1st Sess., p. 11. The task of determining the scope of the term "security" under the Acts has thus fallen to the SEC and to the federal courts. The large number of conceivable commercial and investment arrangements has required the federal courts on numerous occasions to determine whether a given financial interest constitutes a security for purposes of the federal securities laws. From these cases there have evolved several loose but identifiable standards in accordance with which the determination is to be made. At work in the development of these standards—and often as helpful in deciding a given case as the standards themselves—have been myriad policy considerations. These include the desire to effectuate the purposes of the securities laws by focusing on economic realities rather than labels, and the less than uniform effort to avoid federalization of the law of contracts and corporate duty by restricting the scope of the securities laws to those transactions that were the concern of the laws' drafters. In this and other areas of securities law, the trend in recent years has been unmistakably toward greater concern with over-federalization of contract law, and, consequently, in the direction of a more restrictive view of the scope of the federal securities laws. *See International Brotherhood of Teamsters v. Daniel, supra; Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *United Housing Foundation v. Forman, supra.*

This court, then, must decide whether what Braniff claims to be securities are in fact securities for purposes of the Federal Acts by considering the language of the statute and the standards that have been established by prior decisions, with a view toward effectuating the policies of the Federal Acts without according those Acts such an unduly broad reach. Before beginning that analysis, two initial reactions to the federal claims might be noted. First, Braniff's interest in the consolidated tax return and tax management plan of Greatamerica and LTV, and Braniff's right to reimbursement for investment tax credits are hardly "within the ordinary concept of a security." In no reported decision found by or made known to this court have similar interests been held to be "securities" within the meaning of the Federal Acts. Second, the argument that the claims and interests involved here are the legitimate and intended concern of federal legislation must be viewed with skepticism, particularly in view of the recent Supreme Court decisions cited above. This case has all the earmarks of a typical, albeit expensive, contract dispute. Indeed, the federal legislation adds little, if anything, to Braniff's ability to recover the money allegedly owed it except possibly a means of entry into the federal courthouse.

### A. *Investment Contract.*

Braniff first contends that its interest in the consolidated tax returns and tax management plan together with its right to reimbursement of its investment tax credit contribution constitutes an investment contract. "Investment contract" is listed in the statutory definition of a "security" and the term has been the subject of rather extensive judicial scrutiny. In *SEC v. W. J. Howey Co.,* the Supreme Court, drawing on state court decisions that had "crystallized" the meaning of an investment contract before Congress enacted the Securities Acts, held that

. . . . an investment contract for purposes of the Securities Acts means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party . . . . . 328 U.S. at 298–99, 66 S.Ct. at 1103.

This definition—with its four elements of 1) an investment of money 2) in a common enterprise 3) for profits 4) generated from the efforts of others—has been reiterated by the Court in *Forman* and *Daniel*, and has become a kind of sacred measure of the existence of a security. Indeed, the Supreme Court in *Forman* wrote that

> This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. 421 U.S. at 852, 95 S.Ct. at 2060.

In *Howey*, application of this test led to the conclusion that a realty interest in a citrus grove coupled with a service contract for cultivating and marketing the produce from the grove and remitting net proceeds to the investor was a security for purposes of the 1933 Act, each of the four elements of the test being quite clearly met.

In *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548 (1967), the Court held that withdrawable capital shares in a savings and loan association were securities within the meaning of the 1934 Act. The court applied the *Howey* test, found its requirements satisfied and concluded that the shares "have the essential attributes of investment contracts as that term is used in § 3(a)(10) and as it was defined in *Howey*." 389 U.S. at 332, 88 S.Ct. at 554. The court also noted that the shares were securities under other aspects of the statutory definition, including "stock," "transferable share[s]," and "certificate[s] of interest as participation in any profit-sharing agreement."

Both *Tcherepnin* and *Howey* involved rather typical investment situations in which investors had contributed capital to an enterprise in the hope of earning profits through the efforts of others. The result in these cases is unremarkable. The Court was confronted in *Forman* with a set of facts that fit far less neatly into the standard investment situation. The plaintiffs in *Forman* sought the protection of the federal securities laws with respect to nontransferable, nonpledgeable "stock" in a nonprofit enterprise that they had purchased for the purpose of ensuring their right to rent certain low-cost apartments. The Court first rejected the contention that the interests purchased by the plaintiffs were "stock" as that term is used in the statutory definition of security, noting that the interests did not include either the "most common feature of stock: the right to receive 'dividends contingent upon an apportionment of profits,' " 421 U.S. at 851, 95 S.Ct. at 2060, or other attributes commonly associated with stock such as voting rights and negotiability.

The Court then considered whether the interests were investment contracts, focusing closely upon the "profits" element of the *Howey* test. The Court concluded that this element of the test was not met, and that consequently the interests involved were not investment contracts.

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . . In such cases the investor is "attracted solely by the prospect of a return" on his investment. *Howey, supra*, at 300, [66 S.Ct. 1100]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply. 421 U.S. at 852–53, 95 S.Ct. at 2060–2061.

The Court rejected the conclusion of both lower courts that the "profits" requirement was satisfied by the fact that the plaintiffs would be able to deduct for tax purposes portions of the rent they paid for the apartments.

> We know of no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitutes income or profits. These tax benefits are nothing more than that which is available to any homeowner who pays interest on his mortgage. *Id.* at 855, 95 S.Ct. at 2062.

Also rejected was the claim that the profit requirement was satisfied by virtue of the fact that purchase of the stock ensured the right to low-cost housing and substan-

tial savings in rental charges, and the claim that the stock entitled the plaintiffs to the possibility of income derived from the leasing of commercial facilities by the apartment complex, the latter possibility of profits being in the court's view "far too speculative and insubstantial to bring the entire transaction within the Securities Acts." *Id.* at 856, 95 S.Ct. at 2062.

In *International Brotherhood of Teamsters v. Daniel, supra,* the court rejected a contention that an employee's interest in a noncontributory pension plan is an investment contract within the meaning of the Securities Acts. Again the court applied the *Howey* test and found that the employee's interest was characterized by neither an investment of money nor an expectation of profits from a common enterprise. Because the pension fund's income was derived primarily from employer contributions, "a source is no way dependent on the efforts of the Fund's managers," and because "the principal barrier to an individual's realization of pension benefits" was not the fund's financial health but rather the employee's own ability to meet vesting requirements, the Court found the employee's interest in the fund not to involve an expectation of profits from the efforts of others. *See also Black v. Payne,* 591 F.2d 83 (9th Cir. 1979) (employee's interest in contributory pension plan is not a security).

■ Braniff argues here that its interest in the consolidated tax return together with its right to reimbursement for the investment tax credits contributed constitutes an investment contract. Even if it is assumed, however, that Braniff's activities in this regard constituted an investment of money in a common enterprise for profits, Braniff's argument stumbles on the element of the *Howey* test requiring that the expectation of profits derived from the efforts of others. Braniff's right to reimbursement of the tax credits was conditioned only upon *Braniff's* ability to utilize the credits. The amount of Braniff's financial benefit from the plan did not turn on the efforts of LTV or the other members of the LTV group in any significant sense. To be sure, Braniff's

ability to recoup its tax credit contribution depended on the ability of LTV to pay money owed to Braniff and hence on the success of LTV's efforts to remain financially solvent. But this sort of dependence on the efforts of others is characteristic of any contract anticipating future performance, and is not the sort of dependence on the efforts of others contemplated by the *Howey* test. Braniff's benefits from the plan would not have been changed if LTV or other group members doubled or tripled their profits, or incurred huge losses, so long as LTV retained the ability to reimburse Braniff according to their reimbursement contract. Thus Braniff in no way invested in the fortunes of the other companies, and its expected benefits cannot be said to have depended on the efforts of others. A contrary conclusion would lead to the untoward result that any contract contemplating future performance would meet the "efforts of others" element of the *Howey* test.

It is true, as Braniff points out, that the portion of the *Howey* test requiring that the expectation of profits derive *solely* from the efforts of others has been modified in certain circumstances by several courts, including the Fifth Circuit, to require only that the "crucial" profit-making efforts be made by a third party. *Commander's Palace Park v. Girard & Pastel Corp.,* 572 F.2d 1084 (5th Cir. 1978); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir. 1974); *SEC v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Supreme Court expressly declined to adopt or reject the modification in *Forman, supra,* 421 U.S. at 852, n.16, 95 S.Ct. 2051, n.16. Even under the modified standard, however, Braniff's expected benefits from its so-called investment did not turn on the efforts of others, except in the way that all contract contemplating future performance turn on the efforts of others.

Braniff argues further that its benefits from the plan were dependent upon "the skill and efforts" of LTV and other members of the consolidated group to "manage

their tax strategies . . . to maximize the tax benefits to the group, hence to Braniff." (Braniff's Brief in Opposition, p. 23). There are several problems with this contention. First, it must be assumed that when Braniff agreed to contribute its investment tax credits to the consolidated group, it was aware of the tax benefits that would inure to it through participation in the filing of a consolidated return. Thus the tax credits were contributed to the consolidated group by Braniff with the knowledge of what its tax liability would be and in return for the right of reimbursement. Whatever tax savings Braniff may have enjoyed as a result of participation in the consolidated tax return—and LTV claims that these benefits were upwards of $7 million—were not any more the result of the "skill and efforts" of LTV and others in "manag[ing] their tax strategies" than they were the result of Braniff's own efforts. See Commander's Palace Park v. Girard & Pastel Corp., 572 F.2d 1084 (5th Cir. 1978); Peyton v. Morrow Electronics, 587 F.2d 413 (9th Cir. 1978). Braniff did not simply entrust the $8 million in tax credits to LTV so that LTV could employ it to Braniff's financial advantage. Braniff's tax saving was an immediate and bargained-for result of its tax credit contribution that was generated as much by Braniff's efforts as by the efforts of others.

Moreover, the amount of Braniff's tax benefit was determined primarily by Braniff's own financial performance. Braniff's income, expenses, tax credits, and other measures of financial performance figured into the consolidated return and determined how much tax Braniff would have to pay. In this sense, too, Braniff's benefits were determined in large part by its own performance.

In sum, Braniff's participation in the consolidated tax return together with its right to reimbursement of tax credits was not an investment "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Forman, 421 U.S. at 852, 95 S.Ct. at 2060. Braniff therefore did not purchase an investment contract.

Though it is unnecessary to decide whether Braniff's expected gain was "profits" within the meaning of the Howey test, it might be noted that there is significant doubt in this regard. Braniff's expected benefit from its participation in the consolidated tax return was a reduction in tax liability along with the possibility of reimbursement of its tax credit contribution. In Forman, the Court rejected the conclusion of the lower courts that an expectation of tax benefits constituted an expectation of profits for purposes of the Howey test. See also Sunshine Kitchen v. Alanthus Corp., 403 F.Supp. 719 (S.D.Fla.1975). While the interest "purchased" here is distinguishable from the stock purchased in Forman on the grounds that here the tax benefit is significant in amount and central to the plan whereas in Forman it was relatively small in amount and only incidental to the financial scheme, the reasoning of Forman regarding this issue is nonetheless applicable here; the tax benefits that Braniff seeks to characterize as profits are "nothing more than that which is available to any" corporation that participates in a consolidated income tax return. Thus there is significant doubt as to whether the "expectation of profits" element of the Howey test is extant here. In view of the conclusion reached above that the benefit was not to be derived from the efforts of others, however, the decision that there is no investment contract here need not rest on the absence of an expectation of profits.

B. Evidence of Indebtedness or Investment Obligation.

Braniff also urges that LTV's obligation to compensate it for investment tax credits generated by Braniff and used by GA and LTV constituted an "evidence of indebtedness"—a term used in the definition of security in the 1933 Act, 15 U.S.C. § 77b(1)—or an "investment obligation," a term not appearing in either the 1933 or 1934 Act but apparently employed by Braniff to refer to contractual obligations to pay money arising out of an investment, as opposed to a commercial transaction.

An initial question is the extent to which, if at all, the *Howey* test applies to types of securities other than investment contracts. In the language quoted earlier, the Court in *Forman* wrote that the *Howey* test "embodies the essential attributes that run through all of the Court's decisions defining a security." Braniff argues that the Court in its decision has focused meaningfully only on the definition of an investment contract and not on the myriad other forms of securities encompassed by the statutory definition of security, and that, consequently, the quoted language and the *Howey* test pertain only to the question of the existence of an investment contract. The premise of Braniff's argument is not altogether true. In *Forman*, the Court considered not only the term "investment contract" but also the term "stock" as used in the Securities Acts. In *Tcherepnin v. Knight, supra*, the Court considered several elements of the statutory definition of "security," including "certificate of interest or participation in any profit-sharing agreement," "stock," and "transferable share." It is true, however, that the Court has not focused in depth on any of the elements of the statutory definition of "security" aside from investment contracts.

Nonetheless, the quoted language from *Forman* to the effect that the *Howey* test "run[s] through all of the Court's decisions defining a security" suggests no limitation to investment contracts. It would have been easy for the Court to say that the test runs through its decisions defining investment contracts, but to so limit the statement would have rendered it somewhat pointless, since the *Howey* test does more than "run through" decisions defining investment contracts—it *is* the test of an investment contract.

Perhaps this analysis draws too much significance from the minutiae of Supreme Court syntax. But the conclusion that the *Howey* test is not limited to investment contracts is further supported by footnote 11 to the *Daniel* decision. In that footnote, the Court, after discussing another term used in the statutory definition of "security"—"certificate of interest in or participa-tion in a profit-sharing agreement"—and determining that the term is no broader than "investment contract," quotes from *Forman* the "observation" that the *Howey* test runs through all of the Court's decisions defining a security. The implication is that the *Howey* test has application to at least some terms in the statutory definition besides "investment contract." Whether the test refers to types of securities not included within the term "investment contract" remains to be decided. In view of the language in *Forman* and *Daniel*, however, and in view of the fact that the test is at least reiterated in nearly every decision construing the definition of "security," the test must be considered at least relevant in determining whether a financial scheme not characterizable as an "investment contract" is a security. With this in mind, the question of the existence of an investment obligation will be considered.

To begin with, it should be noted that the absence of "evidence of indebtedness" from the definition of security in the 1934 Act is not significant. *Tcherepnin, supra*, 389 U.S. at 344, 88 S.Ct. 548. "Evidence of indebtedness" and what Braniff refers to as an "investment obligation" refer generally to a class of obligations that might generally be referred to as fixed-income obligations, as opposed to equity obligations. While it is often difficult to distinguish between a fixed-income and an equity security, most of the cases discussed to this point have involved what would be characterized as equity securities, that is, securities evidencing an ownership interest and usually including a right to share in profits. This is certainly true of the interests involved in *Howey* and *Tcherepnin;* and in *Forman* and *Daniel* the type of securities that the plaintiffs claimed to possess were in the nature of equity securities. The *Howey* test, with its emphasis on the expectation of profits, would seem to have more direct application to equity securities. A fixed-income security, on the other hand, is characterized typically by an obligation to pay the holder of the security a stated amount of money at a certain time or under certain conditions; it

is essentially a contract for repayment of a loan, and is thus more akin to a commercial contract than is an equity security. Braniff's argument that it purchased an investment contract can be viewed as a contention that it purchased an equity interest in the consolidated tax plan and thus owned an equity security. Its argument that it purchased an evidence of indebtedness or investment obligation can be viewed as urging that it purchased a fixed-income security.

Fixed-income obligations—the most familiar forms of which are bonds and debentures—have given the courts more difficulty in determining whether there is a "security" for purposes of the Federal Acts, for the reason that, as noted above, they are more akin to a contract to pay money than is an equity security. Thus a bond is not significantly different from a promissory note, or even, somewhat further down the spectrum, from a contractual promise to pay money with interest, and the courts have been faced with the difficult task of drawing the line between those fixed obligations to pay money that are securities for purposes of the Federal Acts and those that are not. Read literally, of course, the term "evidence of indebtedness" would encompass every contractual allegation to pay money.

The key conceptual dichotomy that has evolved in response to this problem is the distinction between commercial and investment obligations. *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975); *McClure v. First National Bank of Lubbock,* 497 F.2d 490 (5th Cir. 1974); *Bellah v. First National Bank of Hereford,* 495 F.2d 1109 (5th Cir. 1974). Not surprisingly, the courts have striven to keep outside the purview of federal securities legislation the typical commercial contract evidenced by a promissory note. At work here has been the notion of federalism, which has been an important concern in other areas of securities law. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). The key question here, then, is whether LTV's obligation to reimburse Braniff for investment tax credits

represents an investment by Braniff protected by the Securities Acts or else simply a commercial agreement between the parties not subject to the Acts' strictures. Before reaching that question, one preliminary matter must be noted.

The parties dispute at some length whether an oral obligation can be the subject of an "evidence of indebtedness" as an "investment obligation." As Braniff correctly points out, there is language in several cases to the effect that an obligation need not be in writing in order to be a "security." In *Howey,* for instance, the Court wrote that it is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 328 U.S. at 299, 66 S.Ct. at 1103. *See also* 1 Loss, Securities Regulation 458 (2d ed. 1961). But this language from *Howey* is in the context of a discussion of investment contracts; and the other cases cited by Braniff in support of its argument either involved findings of the existence of an investment contract or else more direct evidence of an indebtedness than is present here. In *Llanos v. United States,* 206 F.2d 852 (9th Cir. 1953), the court found that promissory notes were evidences of indebtedness; in *SEC v. Addison,* 194 F.Supp. 709 (N.D.Tex.1961), the court found that an oral agreement was an investment contract; and in *United States v. Monjar,* 47 F.Supp. 421 (D.Del.1942), *aff'd,* 147 F.2d 916 (3rd Cir. 1945), loan receipts were held to be evidence of indebtedness and investment contracts. Here there are no promissory notes, loan receipts or other written evidence of the obligation except for LTV ledger entries for liabilities due Braniff and LTV prospectuses and proxy statements indicating liabilities due Braniff. Nonetheless, the cases cited by Braniff indicate that the requirement of written evidence of indebtedness is not a stringent one, and that the requirement is met here.

On the other hand, there is language in *United States v. Jones,* 450 F.2d 523 (5th Cir. 1971) that indicates that in order for there to be an "evidence of indebtedness,"

there must be a written instrument. In holding an airline ticket not to be an "evidence of indebtedness," the court wrote:

. . . "evidence of indebtedness" refers to some written document which on its face establishes an obligation to pay a sum of money to the holder without regard to the custom and usage surrounding its actual employment. 450 F.2d at 525.

*Jones* cannot be viewed as controlling here, however, as it was decided not under the Securities Acts but under the National Stolen Property Act, 18 U.S.C. §§ 2311–2318. The obvious and important differences between that Act and the Securities Acts makes application of the *Jones* holding here inappropriate. Thus it must be concluded that the question whether an oral obligation may be an evidence of indebtedness—as any type of "security" except an investment contract—and the related question of what type of evidence of the existence of an obligation is required in order to constitute an evidence of indebtedness are undecided. In view of the discussion below, the questions need not be decided here; it will be assumed for purposes of the discussion that follows that there is sufficient written evidence of LTV's obligation to Braniff to find an evidence of indebtedness or an "investment obligation."

As noted above, the crucial analytical distinction employed in determining whether a fixed income obligation or an obligation to pay a stated amount of money at a certain time or under certain conditions in a security has been the distinction between commercial and investment obligations.

[W]hen we are dealing with documents on the definitional fringes [of the Securities Acts], we must tread carefully. The delicate distinction that determines each case is the commercial investment dichotomy. *Woodward v. Dallas Metro Bank,* 522 F.2d 84, 92 (5th Cir. 1975).

In *Bellah v. First National Bank of Hereford,* 495 F.2d 1109 (5th Cir. 1974), a promissory note and deed of trust issued to a bank in exchange for a loan were held not to constitute a "security," the court noting that the record was "bereft of any evidence indicating that the Bank sought to profit from the successful operation of [the borrower's] enterprise," 495 F.2d at 1113, and concluding that "notes issued in the context of a commercial loan transaction fall beyond the purview of the Act." *Id.* at 1114. The same conclusion was reached in *McClure v. First National Bank,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), with regard to a loan transaction collateralized by a pledge of stock. In *SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir. 1974), on the other hand, application of the commercial/investment test led to the conclusion that notes issued by an impecunious commodities broker were for investment purposes and hence "securities" because "the notes were issued to rejuvenate . . . the enterprise." 497 F.2d at 527.

More recently, in *National Bank of Commerce of Dallas v. All-America Assurance Co.,* 583 F.2d 1295 (5th Cir. 1978), the court found a note given for a loan, with securities pledged as collateral, to be a commercial transaction and hence not protected by the securities laws.

Braniff argues that the linchpin of the decisions applying the commercial/investment dichotomy is the character of the obligee; if the obligee is a bank or an enterprise engaged in the business of making loans, according to Braniff, then the transaction is a commercial one not within the purview of the Securities Acts. Otherwise, Braniff argues, an obligation to pay money is an investment obligation governed by the Federal Acts. This analysis is over-simplified and unsupported by the case law.

In *SEC v. Continental Commodities Corp., supra,* the court was presented with notes issued by a broker in exchange for loans made by customers who were neither banks nor engaged in the business of making loans. Rather then simply focusing on the character of the holders of the notes and concluding on that ground alone that the notes were for investment purposes, the court undertook an extended analysis of the purpose of the notes and their commercial setting. Obviously, the fact that the lenders were neither banks nor persons engaged

in the business of making loans was not considered dispositive by the court. A similar analysis, though less detailed, was undertaken in *National Bank of Commerce of Dallas v. All-America Assurance Co., supra,* though, under Braniff's view, the case could have been decided by simply noting that the lender was a bank. In addition, other courts have found obligations to pay money to be commercial obligations and hence not securities in cases where the lender was neither a bank nor an enterprise engaged in lending money. *See, e. g., United Sportfishers v. Buffo,* Fed.Sec.L.Rep. [CCH] ¶ 96,708 (9th Cir. 1978); *Emisco Industries, Inc. v. Pro's, Inc.,* 543 F.2d 38 (7th Cir. 1976). Then while the character of the obligee may be a factor in determining whether an obligation to pay money in a commercial or an investment transaction, it is by no means a controlling factor.

Braniff also argues that the sheer magnitude of the reimbursement obligation of LTV requires a finding that the obligation be characterized as an investment and not a commercial obligation. While there is language in *Exchange National Bank v. Touche, Ross & Co.,* 544 F.2d 1126, 1137 (2d Cir. 1976), that tends to support Braniff's argument that the size of an obligation to pay money may be a factor in determining the nature of the obligation, nothing in that case or any other case cited by Braniff suggests that the size of the obligation should be dispositive.

■ We are left, then, with the question of whether Braniff's contribution of over $8 million in investment tax credits, and LTV's concomitant obligation to reimbursement Braniff under certain conditions constituted an investment or a commercial transaction. Under the facts presented, it must be concluded that the transaction was a commercial one.

First, as discussed above, Braniff's benefit from the transaction depended primarily upon its own performance and its own ability to use investment tax credits in the years following the transaction. Braniff's benefits depended upon the performance of LTV

only in the limited sense that repayment depended upon LTV's solvency; for all practical purposes, though, Braniff's gain from the transaction was not "conditioned upon profit or productivity of [LTV]," *National Bank of Commerce of Dallas v. All-America Assurance Co., supra* at 1301. Moreover, there is no contention or indication that the tax credits "loaned" to the LTV group were forced loans or were made for the purpose of "rejuvenating" LTV. *See SEC v. Continental Commodities Corp., supra;* Annot., 39 A.L.R.Fed. 357, 405 (1978).

Braniff argues that it did indeed "invest" in the consolidated tax return with an expectation that its profits would reflect the performance of LTV and the other companies involved; but the summary judgment facts simply do not bear out this contention. Braniff did not turn over the tax credits to LTV and then sit back and hope that LTV's skillful management of the funds would bring it [Braniff] financial reward. On the contrary, Braniff knew what its benefits would be, and it knew that its future right to reimbursement, and hence its ultimate gain from the transaction, would turn on its own performance and its own ability to use the tax credits. This is hardly characteristic of an investment; it is, however, characteristic of a commercial transaction. This court concludes, then, that Braniff purchased no security for purposes of the Federal Securities Acts.

■ That conclusion, in turn, requires that summary judgment be granted in LTV's favor on the Federal Securities claims, and that all other claims be dismissed for want of jurisdiction. While LTV has not so argued, it is plain that with the summary disposition of the federal claims, the court ought not hear the state law claim under its pendent jurisdiction.[1] *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The other points raised by LTV's motion for summary judgment need not be reached.

LTV's motion for summary judgment on claims under the Federal Securities Acts is

1. At first glance, it would appear that the Texas Securities Act claim is so closely related to

the Federal Securities claims that it ought to be decided by this court in the interests of judicial

GRANTED. All remaining claims are DISMISSED for want of jurisdiction.

economy. Despite the substantial similarity between the definition of "security" in the Texas Securities Act, Tex.Civ.Stat.Ann. art. 581–4 (Vernon 1964), and the definition of the same term in the Federal Acts, however, it appears that the Texas Courts have taken a somewhat more expansive view of what constitutes an "evidence of indebtedness" under the Texas Act than have the federal courts under the Federal Acts. *See Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637 (Tex.1977). In addition, in interpreting the Texas Act, notions of federalism either do not figure into the analysis or else cut in a different direction than in interpretation of the Federal Acts. In view of these circumstances, and in view of the uncertain state of Texas law on this subject, this court declines to exercise pendent jurisdiction over the Texas Securities Act claim.