## EL DORADO BANCSHARES, INC., Plaintiff,

### v.

Charles J. MARTIN, Steven C. Martin, Robert L. Martin, and Mary L. Martin, Defendants.

### Civ. A. No. 88–2100–O.

United States District Court, D. Kansas.

Dec. 12, 1988.

Randolph G. Willis and Randall Rings, Watson, Ess, Marshall & Enggas, Olathe, Kan., for plaintiff.

B.J. Hickert, Morrison, Hecker, Curtis, Kuder & Parrish, Wichita, Kan., Michael J. Jerde, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on the motion of the plaintiff El Dorado Bancshares, Inc., (El Dorado) for the court to reconsider its memorandum and order dated October 13, 1988.[1] El Dorado brought an action against the defendants Charles J. Martin, Steven C. Martin, Robert L. Martin, and Mary L. Martin (the Martins) seeking recovery of money damages for breach of

---

1. El Dorado contends that the response of the defendants Charles J. Martin, Steven C. Martin, Robert L. Martin, and Mary L. Martin (the Martins) was untimely filed. El Dorado filed its motion on October 27, 1988. The Martins filed their response on November 15, 1988. When holidays and Sundays are excluded from the three day mailing period, and when holidays and weekends are excluded from the ten day response period, it is evident that the Martins' response was timely.

**1516**

fiduciary duty (count 1), violations of the federal securities laws (count 2), and violations of state securities laws (count 3). The Martins moved for summary judgment, and our order dated October 13, 1988, granted their motion. However, in our order, we stated: "[W]e are compelled to comment that we are somewhat hesitant to render summary judgment given the confusing state of the current record.... [W]e will examine with particular care a timely submitted motion for reconsideration with accompanying evidence...." Having received such a motion, we now re-examine the facts and our earlier conclusions.

I. The Facts.

El Dorado is a bank holding company with one principal asset: Citizens State Bank of El Dorado, Kansas (CSB). Prior to September 23, 1982, the Martins, along with other individuals, were the officers, directors, and owners of seventy-five percent (75%) of the stock of El Dorado. During 1982, differences arose between these directors of El Dorado and Steven Baker (Baker), the twenty-five percent (25%) owner and the president of El Dorado and the chief executive officer and chairman of the board of CSB.

Apparently, because of their differences, Baker and the directors determined that one or the other must end affiliation with El Dorado and CSB. In July 1982, El Dorado and the directors executed a document entitled "Redemption Agreement" whereby El Dorado agreed to purchase from the directors 432,546 shares of stock for a total price of $1,654,288.86. In September 1988, the directors sold their stock, but the parties disagree as to the details surrounding the transaction. The Martins assert that Baker purchased the stock of the directors, including the Martins. For support, they rely on an El Dorado stock certificate dated September 23, 1982. The certificate indicates that Baker is the registered holder of 432,546 shares of stock; however, the certificate does not state what party was the transferor of the shares. The certificate does include the original certificate numbers of the shares held by Baker, which are somewhat legible when reading the photo-

copy of the document, and which indicate that the stock was originally issued to the directors. However, this evidence does not prove that the directors sold directly to Baker; it is possible that the stock was purchased by El Dorado, held as treasury stock, and then transferred by El Dorado to Baker.

El Dorado contends that the directors sold their stock to El Dorado, which in turn sold the stock to new investors. For support, El Dorado relies on the affidavits of two of the new investors. However, although the affidavits themselves state that the new investors purchased their stock from El Dorado, the exhibits accompanying the affidavits indicate that Baker was the transferor of the stock. In exchange for their stock, El Dorado contends that the directors received $2,029,580.45 in cash and $2,179,435.79 in the form of relief from stock loans.

The court interprets the evidence surrounding the September 1982 stock transfers as follows: Pursuant to the agreement that either he or the other directors must go, in September 1982, Baker solicited potential investors to purchase an interest in El Dorado. These investors were to receive the 432,546 shares of stock which had been held by the directors. On September 23, 1988, the investors contributed capital to El Dorado. On the same date, the directors sold their stock, either to El Dorado or directly to Baker. In any event, Baker was issued an El Dorado stock certificate indicating that he held 432,546 shares. Later, Baker transferred these shares to the new investors.

Two of the new investors were Wally McClanahan (McClanahan) and Richard Teichgraeber (Teichgraeber). As with the transactions whereby the directors sold their stock, the transactions whereby the new investors purchased their interests are confusing, poorly delineated, and interpreted in different manners by El Dorado and the Martins. El Dorado contends that on September 23, 1988, McClanahan paid El Dorado $250,000.00; in return, on October 4, 1982, he became the registered holder of 32,873.496 shares of stock (previously reg-

istered to Baker), and he received a promissory note from El Dorado (signed by Baker) in the amount of $75,491.63. El Dorado further asserts that on September 23, 1988, Teichgraeber paid El Dorado $350,000; in return, on October 4, 1982, he became the registered holder of 57,096.072 shares of stock (previously registered to Baker), and he received a promissory note from El Dorado (signed by Baker) in the amount of $46,906.46.

The Martins assert that the initial investment of McClanahan and Teichgraeber in El Dorado was more complicated. They contend, and we agree, that the facts surrounding the transaction were as follows: In mid-September 1982, McClanahan, acting for himself and for Teichgraeber (McClanahan was Teichgraeber's son-in-law, they were in business together, and they had previously expressed an interest in buying a stake in El Dorado), met with Baker to discuss investment in El Dorado. A certified public accountant representing McClanahan and Teichgraeber attended one meeting. Prior to September 23, 1982, the accountant made a cursory review of some general financial information relating to El Dorado. Apparently, on September 23, 1982, McClanahan and Teichgraeber decided to invest. McClanahan paid $250,000.00 and Teichgraeber paid $350,000 *to Baker*,[2] and in return, they received El Dorado stock which Baker held (the number of shares that they received was contingent on the market value of the stock). Additionally, Baker arranged for El Dorado to execute promissory notes to McClanahan in the amount of $75,491.63 and to Teichgraeber in the amount of $46,906.46. However, McClanahan and Teichgraeber were somewhat uncertain about the investment because they had not had an ade-quate opportunity to review in detail the financial documents of El Dorado and CSB, and they therefore agreed with Baker that their investment was conditional: they would have thirty days from the date on which they received the full financial statements of El Dorado in which to determine whether they would fully honor their initial, conditional commitment. Eventually, the accountant was furnished with more-detailed records, but he never received the scope of information which McClanahan and Teichgraeber anticipated. Following the accountant's review, McClanahan and Teichgraeber demanded a reduction in the price that they paid for their shares. Eventually, Baker agreed to reduce the price paid by McClanahan by $100,000.00, and the price paid by Teichgraeber by $200,000.00. Teichgraeber, acting for himself and for McClanahan, agreed to accept notes for these amounts from Baker if the notes were collateralized. On January 14, 1983, Baker executed notes indicating that he was indebted to McClanahan in the amount of $100,000.00, and to Teichgraeber in the amount of $200,000.00; the notes were never collateralized.

On March 30, 1983, McClanahan and Teichgraeber brought an action in Kansas state court against Baker to collect on the notes. The action was dismissed without prejudice on August 23, 1983. On October 23, 1983, McClanahan and Teichgraeber brought an action in Kansas state court against El Dorado, Baker, the Martins, and the other original directors, seeking rescission of their purchase of stock and damages in the amount of $600,000.00 for alleged violations of federal banking laws with respect to the September 1983 transactions. The action was removed to feder-

---

2. The court has had considerable difficulty determining to whom McClanahan and Teichgraeber paid their money when they invested. El Dorado contends that McClanahan and Teichgraeber paid El Dorado, whereas the Martins assert that McClanahan and Teichgraeber paid Baker. We agree with the Martins for two reasons: First, the stock certificates which McClanahan and Teichgraeber received indicated that Baker was the transferor of their shares. Second, and more importantly, as discussed below, McClanahan and Teichgraeber negotiated for a reduction in the price which they paid for their shares. As their reduction, they received promissory notes executed by, and apparently enforceable only against, Baker. The court does not believe that investors who purchased stock directly from a corporation would settle for a reduction of their purchase price in the form of a personal promissory note from the corporation's chairman. Instead, it is more logical, and it is the court's conclusion, that McClanahan and Teichgraeber purchased from Baker, and they therefore later received Baker's personal promissory note as a reduction in their stock price.

al court and then remanded to state court; McClanahan and Teichgraeber have settled their claims against El Dorado, but the other claims apparently are still pending. McClanahan and Teichgraeber filed another complaint in state court against Baker, the Martins, and the other original directors, asserting that Baker made misrepresentations in connection with making illegal loans associated with the September 1982 transaction, and that the other defendants knew or should have known of the illegality of the loans and rejected the loans. This complaint prays for a judgment in excess of $10,000.00, and it too is pending.

On April 30, 1984, McClanahan sold his 32,874 shares of El Dorado stock to James H. Hentzen (Hentzen) for $32,874.00. On the same date, Teichgraeber sold his 57,096 shares to Hentzen for $57,096.00. Additionally, Hentzen agreed that if El Dorado defaulted on the promissory notes it issued on September 23, 1982, to McClanahan in the amount of $75,491.63 and to Teichgraeber in the amount of $46,906.46, Hentzen would personally purchase the notes from McClanahan and Teichgraeber for an amount equal to the principal plus interest.

On March 23, 1987, McClanahan and Teichgraeber made demand on El Dorado for payment of the notes executed on September 23, 1982. El Dorado did not pay, and McClanahan and Teichgraeber therefore made demand on Hentzen. He informed them that he was unable to pay on the notes. Eventually, on January 22, 1988, McClanahan, Teichgraeber, and Hentzen (the primary stockholder and president of El Dorado at the time) entered into an agreement in settlement of McClanahan's and Teichgraeber's claims against El Dorado in the October 23, 1983, state court action. Under the agreement, McClanahan and Teichgraeber each paid Hentzen $10,-000.00 and promised not to sue him for his obligation with respect to the September 23, 1982, notes; in return, Hentzen, who then owned approximately ninety percent (90%) of El Dorado, transferred his entire interest in El Dorado to McClanahan and Teichgraeber. When they became the new principal owners of El Dorado, McClanahan and Teichgraeber knew that CSB had been declared insolvent and that El Dorado's primary asset was any claim it had against the former officers and directors of El Dorado and CSB for their actions with regard to the stock transfers and loans of the fall of 1982. They invested in El Dorado primarily for the purpose of pursuing this claim.

On February 25, 1988, El Dorado filed a complaint in this court against the Martins, seeking recovery of money damages for breach of fiduciary duty (count 1), violations of the federal securities laws (count 2), and violations of state securities laws (count 3). The complaint alleges that in spite of their knowledge that Baker was engaged in wrongdoing in connection with his activities related to El Dorado and CSB, the Martins arranged to sell their stock and cease their duties as officers and directors without revealing Baker's misdeeds. Additionally, the Martins appointed Baker to act as their agent in connection with the stock sale, in spite of their knowledge that El Dorado would be rendered virtually without capital as a result of the sale, and that Baker would therefore arrange illegal loans to encourage the new investors to contribute capital to El Dorado.

## II. Our Earlier Order.

The Martins filed a motion to dismiss, which the court considered as a motion for summary judgment. On October 13, 1988, we entered an order granting the motion. El Dorado's motion for reconsideration of that order is currently before the court.

Our earlier order was based primarily on the United States Supreme Court case of *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). In analyzing *Bangor Punta*, we borrow extensively from our earlier order: *Bangor Punta* involved a complaint by a corporation alleging mismanagement by its former owners during the period of their control. *Id.* at 705, 94 S.Ct. at 2580. The court initially noted that under a settled principle of equity, "a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who partici-

pated or acquiesced in the allegedly wrongful transactions." *Id.* at 710, 94 S.Ct. at 2583. Similarly, a shareholder who purchases all or nearly all of a corporation's stock from a vendor may not seek to have the corporation recover from the vendor for prior mismanagement. *Id.* Citing extensively to the opinion of Dean Pound of the Nebraska Supreme Court in *Home Fire Insurance Co. v. Barber,* 67 Neb. 644, 93 N.W. 1024 (1903),[3] the Court reasoned that allowing recovery by such shareholders would result in a windfall because they acquired their shares after the alleged wrongs had occurred, the purchase price of their shares thus reflected the alleged damage inflicted on the corporation, and the shareholders had therefore received the full benefit of their bargain. *See* 417 U.S. *id.* at 712, 94 S.Ct. at 2583. The Court further held that "where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." *Id.* at 713, 94 S.Ct. at 2584.

In our earlier order, we looked at two distinct time periods: the period in the fall of 1982 when the new investors, including McClanahan and Teichgraeber, acquired stock and promissory notes from El Dorado, and the period from 1984 to 1988, when McClanahan and Teichgraeber sold and eventually repurchased their El Dorado stock. The basic thrust of our order was that McClanahan and Teichgraeber had (1) purchased El Dorado stock at a price that did not reflect the alleged misdeeds by Baker and the other original directors, including the Martins, (2) sold the stock to Hentzen in 1984 at a price which similarly did not reflect the alleged misdeeds, and (3)

repurchased stock from Hentzen at a discounted price which fully reflected the alleged misdeeds. We concluded that McClanahan and Teichgraeber would therefore receive a windfall if they were allowed to recover for the alleged misdeeds, as their earlier sale and purchase were a wash (because neither the price they paid nor the price they received reflected the misdeeds), and in their recent purchase, they paid a discounted price reflecting the alleged wrongs. Further, given the holding in *Bangor Punta,* El Dorado was precluded from recovery because of the inability of McClanahan and Teichgraeber to recover.

## III. Reconsideration.

El Dorado has moved for reconsideration of our earlier order. Having carefully examined the parties' briefs and the accompanying evidence, we find that portions of our earlier order were based on erroneous facts, which in turn led to faulty conclusions. Thus, we must re-examine the issue of whether summary judgment should be rendered for the Martins.

### A. *Summary Judgment Standards.*

When considering a motion for summary judgment, we must examine all evidence in the light most favorable to the opposing party. *Prochaska v. Marcoux,* 632 F.2d 848, 850 (10th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). If the moving party bears the burden of proof at trial, he must show, through pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.

---

**3.** *Home Fire* held that where all of the shareholders of a corporation had purchased their shares from a wrongdoer at a discounted price reflecting corporate mismanagement, the corporation had no standing to recover from the former owners of the shares. The *Home Fire* decision rested on three interrelated principles: (1) the "tainted shares" doctrine, under which a shareholder may not recover for alleged corporate mismanagement if his transferor was involved in the mismanagement; (2) the contemporaneous ownership rule, under which a shareholder may not recover unless he was a shareholder at the time of the alleged corporate mismanagement; and (3) the equitable principle of unjust enrichment, under which a shareholder may not recover if he purchased his stock at a price which already reflected the alleged corporate mismanagement. *See National Union Electric Corp. v. Matsushita Electric Industrial Co.,* 498 F.Supp. 991, 996 (E.D.Pa.1980) (interpreting *Home Fire* ). *Bangor Punta* touches on each of these issues. However, as we read *Bangor Punta,* the determination of whether shareholders can recover rests primarily on whether such a recovery would result in a windfall; the tainted shares doctrine and the contemporaneous ownership rule are analytical aids to be used in this determination.

Civ.P. 56(c). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record demonstrating an absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553.

If the moving party meets his requirement, the burden shifts to the nonmoving party, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). The trial judge then determines whether a trial is needed—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

### B. *The Windfall Issue.*

■ Our earlier order was based in large part on our conclusion that, given the facts, a recovery by McClanahan and Teichgraeber would result in a windfall. Specifical-

ly, we assumed that when McClanahan and Teichgraeber sold their stock to Hentzen in 1984, the sale price did not reflect the alleged corporate misdeeds which occurred in the fall of 1982. However, evidence now before the court indicates that the alleged misdeeds had been discovered by 1984, and that the price which McClanahan and Teichgraeber received for their stock was therefore discounted. McClanahan and Teichgraeber originally paid $250,000.00 and $350,000.00, respectively, for El Dorado stock plus promissory notes executed by El Dorado in the amounts of $75,491.63 to McClanahan and $46,906.46 to Teichgraeber. Because they were unsatisfied with their bargain, Baker executed further promissory notes to McClanahan in the amount of $100,000.00 and to Teichgraeber in the amount of $200,000.00 (as discussed in footnote 2, the court reads these documents to be executed by Baker, not by El Dorado; thus, McClanahan and Teichgraeber apparently agreed to allow some of their capital contribution to be backed not by El Dorado stock or El Dorado notes, but by a promissory note personally executed by Baker). A summary of these transactions, and the nature of McClanahan's and Teichgraeber's investment, is as follows:

| | DATE | TOTAL INVESTMENT | EL DORADO STOCK | EL DORADO NOTES | BAKER NOTES |
|---|---|---|---|---|---|
| McClanahan | 9/82 | $250,000.00 | $174,508.37 | $75,491.63 | $ 0.00 |
| | 1/83 | 250,000.00 | 74,508.37 | 75,491.63 | 100,000.00 |
| Teichgraeber | 9/82 | $350,000.00 | $303,093.54 | $46,906.46 | $ 0.00 |
| | 1/83 | 350,000.00 | 103,093.54 | 46,906.46 | 200,000.00 |

In 1984 McClanahan and Teichgraeber sold their stock, but they did *not* sell the promissory notes which they held. As indicated above, at the time they sold their stock, McClanahan and Teichgraeber had investments of $74,508.37 and $103,093.54, respectively, in the stock; the remainder of their original investments was in the form of promissory notes. McClanahan received $32,874.00 for his stock, plus Hentzen's promise that he would honor the promissory notes executed by El Dorado if El Dora-

do defaulted; thus, he incurred a loss on the stock of no more than $41,634.37. Teichgraeber received $57,096.00 for his stock, plus Hentzen's promise that he would honor the promissory note executed by El Dorado if El Dorado defaulted; thus, he incurred a loss on the stock of no more than $45,997.54. However, between 1984 and 1988, McClanahan and Teichgraeber incurred more losses, as El Dorado and Hentzen refused or failed to pay the September 23, 1982, promissory notes.[4] McClanahan

---

4. Baker also defaulted on his notes of $100,-000.00 to McClanahan and $200,000.00 to Teichgraeber. However, the court is of the opinion that these notes should not be considered when assessing the alleged loss which McClanahan

and Teichgraeber incurred as a result of the Martins' actions. Baker overcharged McClanahan and Teichgraeber when he sold them El Dorado stock, and as a result, the notes were issued. It may be argued that the notes would

held a note for $75,491.63, so his total loss following the defaults was $121,489.17. Teichgraeber held notes totalling $46,906.46, so his total loss following the defaults was $92,904.00.

Thus, considering only the period prior to 1988 (when McClanahan and Teichgraeber repurchased the majority of El Dorado stock), McClanahan and Teichgraeber would not receive a windfall if they could maintain an action against the Martins for their alleged wrongdoing. McClanahan and Teichgraeber purchased the stock and the notes at a price that did not reflect the wrongdoing (which occurred in connection with the sale of the stock and the notes), and they sold the stock at a discounted price and did not receive payment on the notes because of the wrongdoing.

Further, McClanahan and Teichgraeber would not receive a windfall simply because in 1988 they repurchased the stock at a discounted price which accurately reflected its value at the time of the repurchase. In analyzing the windfall issue, the court must look at the "big picture." Here, McClanahan and Teichgraeber sustained significant losses before their repurchase, and thus they would receive no windfall. Therefore, the *Bangor Punta* holding, which disallowed recovery by a corporation where its shareholders could not recover because they would receive a windfall, is inapplicable. El Dorado has produced sufficient evidence to avoid summary judgment as to the issue of a windfall to McClanahan and Teichgraeber.

### C. *Damage to El Dorado.*

■ The Martins assert that even if sufficient evidence regarding injury to McClanahan and Teichgraeber is presented, there is inadequate evidence of injury to El Dorado, the plaintiff in this action. We dis-

agree. The court has before it adequate evidence that illegal loans were extended in connection with the transactions taking place in the fall of 1982. Further, sufficient evidence indicates that the failure of CSB, El Dorado's principal asset, was caused at least in part by the loans. Thus, El Dorado sustained damages as a result of the Martins' alleged misdeeds in connection with the loans and the transactions in the fall of 1982.

Further, the holding in *Bangor Punta* does not preclude recovery by El Dorado, as the Martins appear to argue. *Bangor Punta* recognized that generally, a corporation and its shareholders are distinct entities for legal purposes, but that where equity would preclude an action by the shareholders, the corporation is similarly precluded. *Bangor Punta*, 417 U.S. at 713, 94 S.Ct. at 2584. Here, equity does not preclude an action by the shareholders, and therefore El Dorado is not precluded from maintaining an action.

### D. *Summary.*

In sum, the Martins' original motion for summary judgment was based on the argument that *Bangor Punta* would preclude recovery by McClanahan and Teichgraeber, and therefore, El Dorado should be precluded from recovery. Upon further analysis, the court finds sufficient evidence indicating that *Bangor Punta* would not prevent McClanahan and Teichgraeber from recovering, and therefore, El Dorado may maintain an action. Thus, we vacate our order dated October 13, 1988, and we deny the Martins' motion for summary judgment.

IT IS THEREFORE ORDERED that El Dorado's motion for reconsideration is granted. The court's order dated October

---

never have been issued had the Martins fulfilled their fiduciary duties and precluded Baker from arranging the alleged illegal loans which backed the transactions in the fall of 1982. However, the court is of the opinion that by choosing to accept the personal notes of Baker in lieu of El Dorado stock or notes, McClanahan and Teichgraeber discarded any avenues of relief they might possibly have had against El Dorado or its officers and directors. In other words,

McClanahan and Teichgraeber may only look to Baker for recovery of the capital they contributed to Baker which was backed by Baker's personal notes. Thus, when figuring the total loss incurred by McClanahan and Teichgraeber for purposes of this action, we have ignored the notes of $100,000.00 and $200,000.00. In any event, the treatment to be given the notes is not central to and will not affect the court's ruling on the instant motion.

13, 1988, is hereby vacated, and the Martins' motion for summary judgment is denied.